**GREENSTONE SHIPPING CO., S.A. and A. Halcoussis & Company, Plaintiffs,**

v.

**TRANSWORLD OIL, LTD. OF HAMILTON, BERMUDA, Defendant.**

**Civ. A. No. 84–41 CMW.**

United States District Court,
D. Delaware.

Feb. 29, 1984.

On Renewed Motion for
Summary Judgment
March 21, 1984.

Peter M. Sieglaff, and David A. Anderson, of Potter, Anderson & Corroon, Wilmington, Del., for plaintiffs; Richard W. Palmer, Michael B. McCauley, and Todd G. Atkinson, of Palmer, Biezup & Henderson, Philadelphia, Pa., of counsel.

Jacob Balick, of Balick & Yucht, Wilmington, Del., for defendant; Dante Mattioni, and Faustino Mattioni, of Mattioni, Mattioni & Mattioni, Philadelphia, Pa., of counsel.

## MEMORANDUM OPINION

CALEB M. WRIGHT, Senior District Judge.

### INTRODUCTION

Presently before the Court in this case is plaintiffs' Motion For Entry Of An Order Granting Plaintiffs' Claim For Freight Due on a voyage from Dairen, China to Seaview Petroleum Terminal in Paulsboro, New Jersey. For the reasons discussed below, the Court denies plaintiffs' motion.

This case arises out of a voyage charter party (hereinafter "Charter Party") entered into on August 25, 1983 between A. Halcoussis & Company of Piraeus, Greece (hereinafter "Shipowner") and Transworld Oil, Ltd. of Hamilton, Bermuda (hereinafter "Charterer"). The Charter Party provided for a voyage by the vessel M/T YPATIANNA with a cargo of crude oil from Dairen, China to a safe port on the Atlantic or Gulf Coast of the United States. *See* Clause 3 of Charter Party, Exhibit A attached to Defendant's Answering Brief (Dkt. No. 8). The Charter Party also provided that Charterer had the right to nominate and change the specific discharge ports and berths after loading was completed and the vessel was underway. *See* Clauses 4, 23 and 27 of the Charter Party. Pursuant to the terms of the Charter Party, Charterer nominated Seaview Petroleum Terminal as the discharge berth.

The ship loaded its cargo of Daquing crude oil [1] on September 15 and 16, 1983 and departed from Dairen on September 21, 1983. Because of various alleged problems along the way,[2] the ship did not arrive at Big Stone Beach Anchorage in Delaware Bay until December 15, 1983, at which time the Master tendered her Notice of Readiness. The parties dispute whether the ship was in fact ready to discharge at that time.[3] In any event, discharging of the cargo did not commence until December 26, 1983. A discharge at Big Stone Beach Anchorage of approximately 175,000 of the 699,634.5 barrels of oil on the ship into barges was necessary in order to decrease the ship's draft so that she could proceed up the Delaware River to the Seaview Terminal berth nominated by the Charterer. This discharge took from December 26

---

1. Daquing crude oil is apparently a low sulphur heavy crude oil with a "pour point" of 86 degrees Fahrenheit. The pour point is the temperature at which the oil will start to flow. The oil must be heated above the pour point in order to be handled efficiently. Charterer has alleged that the oil was heated to 97.9 degrees when it was loaded onto the ship in Dairen. *See* Defendant's Answering Brief at 4–5 (Dkt. No. 8). The Charter Party provides that the vessel was equipped with heating coils that could maintain the cargo at its loaded temperature during the voyage and could heat and maintain the cargo at a temperature of 120 degrees Fahrenheit for seven days prior to and during discharge. *See* Clauses 1 and 32 of Charter Party. In the event that the cargo temperature was not maintained as specified and resulted in any delay or withdrawal of the vessel from the discharging berth, the Charter Party provided that all time and expenses incurred were for Owner's Account. *See* Clause 32 of Charter Party.

2. Charterer alleges that the ship had to stop a number of times during the voyage to take on supplies of fresh water because the heating coils were leaking and using up the fresh water supply. Charterer also alleges that the ship had numerous engine breakdowns, blackouts, power failures, and fires during the course of the voyage. *See* Defendant's Answering Brief at 5–8 (Dkt. No. 8). In addition to the problems mentioned above, Charterer claims that the crew was replaced several times, the Chief Engineer was fired for incompetence and the Master failed to look at the sailing instructions and proceeded through the Suez Canal rather than around the Cape of Good Hope. *See id.* at 6–8. Charterer concludes that a voyage that should have taken a maximum of fifty days if the vessel had proceeded at the average speed of 12.5 knots as required by the Charter Party, *see* Clause 71 of Charter Party, ended up taking approximately 86 days. *See* Defendant's Answering Brief at 7 (Dkt. No. 8).

3. Shipowner contends that Charterer refused to accept the Notice of Readiness even though the cargo was in fact at an average temperature in excess of the temperature existing at the time the cargo was loaded. *See* Plaintiffs' Brief in Support of Their Motion to Direct Defendant to Pay Freight Due (Dkt. No. 10) at vii. Charterer contends that the cargo was not heated to the required 120 degrees Fahrenheit and that a sufficient temperature to pump the oil was never achieved. Charterer also alleges that he provided a heated barge to the ship on December 26, 1983 in order to mitigate damages. *See* Defendant's Answering Brief at 8 (Dkt. No. 8).

through December 29, 1983, and the ship departed Big Stone Beach Anchorage on December 30, 1983.

Unfortunately, the ship ran aground shortly after she left Big Stone Beach Anchorage and it was necessary to have a barge come alongside and take additional oil so that the ship could get off the bottom. After this was done, the ship returned to Big Stone Beach Anchorage and did not depart for Seaview Terminal until January 3, 1984. Upon the ship's arrival at Seaview Terminal, discharge of the oil commenced. Because of various alleged problems,[4] discharge was not completed within the period of time anticipated by the Terminal and the Terminal representatives advised the Master that the ship was to move off the berth by 0500 hours on January 7, 1984. According to Charterer, the ship's representatives then told the Terminal that all discharging could be completed by midnight and the Terminal agreed to let the discharging continue up to that time, provided the vessel would leave the berth by noon the next day. *See* Defendant's Answering Brief at 10 (Dkt. No. 8). However, the vessel could not complete the discharge within that time and at 1230 hours on January 8, 1984, the ship, under protest, departed from Seaview Terminal with slightly more than 57,000 barrels of oil still on board.

The ship proceeded to a berth at Pier 96 South in Philadelphia. No further discharge of the oil occurred until January 27, 1984, after Shipowner arranged to have a barge come alongside the ship to take the remainder of the oil and deliver it to Seaview Terminal. However, after approximately 20,000 barrels of oil were discharged into the barge, the ship's generators failed, resulting in a decrease in the inert gas level of the cargo tanks and an order by the U.S. Coast Guard to cease discharge operations until the required level was restored. *See* Exhibit C to Defendant's Answering Brief (Dkt. No. 8). After the Coast Guard order, discharge was not resumed and the barge left for Seaview Terminal.

On January 31, 1984, Shipowner, by telex, requested permission to move the ship from Pier 96 South to the Publicker Terminal at Pier 106 South and to discharge into a shore tank. *See* Exhibit D to Defendant's Answering Brief (Dkt. No. 8). Charterer agreed to let the vessel move, without prejudice to their rights under the Charter Party. Charterer expressly stated by telex, dated February 1, 1984, that "Charterer will not repeat will not nominate the berth at Publickers and will not accept any responsibility for a move by the vessel owner to said berth." Charterer also expressly stated in that telex that "discharge into a Publicker tank shall not be construed as either a delivery of the cargo or a discharge of the cargo for the purposes of determining when freight is due and payable." *See id.* Nonetheless, on February 2, 1984, the ship shifted to the Publicker Terminal and started discharging. Discharging continued through February 3, 1984 and then the vessel returned to Pier 96 South. According to Shipowner, approx-

---

**4.** Charterer alleges the following: "At 1620 hours on January 4, 1984, the U.S. Coast Guard stopped discharge operations because the ship had problems with the inert gas system and had a patch on the manifold … Discharging resumed from one hose at 1930 hours on January 4, 1984. Discharging from the second hose resumed at 2225 hours … The ship stopped discharging at 0549 on January 5, 1984 due to a problem with a hydraulic valve. Discharging resumed at 0730 hours. At 2040 hours, discharging was stopped so the ship could try to increase the cargo temperature. Discharging resumed at 2305 hours. On January 6, 1984, the ship started taking steam from the terminal to use in heating the cargo. This apparently proved of little value and it was stopped after an hour. At 1510 hours, discharging was stopped. Discharging did not resume until 1235 hours on January 7, 1984 and even then, only one hose was used." *See* Defendant's Answering Brief at 10 (Dkt. No. 8).

The Charter Party provides that the pumping pressure on the ship's rail should be 100 PSI and that the ship should complete discharge within 24 hours, excluding stoppages demanded solely by the shore terminal. *See* Clauses 15 and 67. It also provides that any delay and expenses incurred due to problems with the inert gas system and other equipment are for Owner's Account. *See* Clauses 11, 58, 76.

imately 32,000 barrels were discharged into the Publicker Terminal, leaving 5081.1 barrels on board which have been certified as unpumpable by two independent marine surveyors. *See* Exhibits D and E attached to Plaintiffs' Motion For An Order For The Payment Of Freight (Dkt. No. 4). According to Charterer, approximately 8,135 barrels of oil remain on board and are pumpable when heated to the 120 degrees Fahrenheit specified in the Charter Party.[5] *See* Defendant's Answering Brief at 21 (Dkt. No. 8). In any event, after discharge into the Publicker Terminal was completed, Shipowner telexed Charterer and informed him that freight was owed in the amount of $1,294,031.13, payable telegraphically to William & Glyns Bank, Piraeus, Greece. When the Charterer refused to pay freight, Shipowner filed this action.[6]

## DISCUSSION

While plaintiffs have characterized their motion as a motion to direct defendant to pay freight due, it is clear to the Court that the relief requested by plaintiffs is a ruling that plaintiffs are entitled to freight as a matter of law. Since this is the case, the Court will treat this motion as it would treat any other motion for summary judgment and will only grant the motion if there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(c). Any doubt as to the existence of genuine issues of fact will be resolved against the moving party and any reasonable inferences from the facts will be resolved in favor of the party against whom the judgment may be entered. *See Peterson v. Lehigh Valley Dist. Council, United Bhd. of Carpenters and Joiners,* 676 F.2d 81, 84 (3d Cir.1982); *Hollinger v. Wagner Mining Equipment Co.,* 667 F.2d 402, 405 (3d Cir.1981).

The central issue in determining whether plaintiffs are entitled to freight as a matter of law is whether plaintiffs, as Shipowners, have fulfilled their obligation of delivery to the destination nominated by defendant, as Charterer, under the terms of the Charter Party.[7] If there was a proper delivery, then freight is due and payable, regardless of any claims Charterer may have for shortage or cargo damage. *See Compagnie DiNavigazione Mauritius Rome v. Kulukundis,* 182 F.Supp. 258, 263 (E.D.N.Y.1959), *aff'd.,* 277 F.2d 161 (2d Cir. 1960) (liability to pay freight is "an independent obligation and is not discharged because of failure to deliver the cargo in good condition"); *Compania Naviera Puerto Madrin S.A. Panama v. Esso Standard Oil Co.,* 1962 A.M.C. 169–70

**5.** Under Clause 55 of the Charter Party, Charterer has "the right to deduct from freight an amount equal to the FOB port of loading value of such cargo plus freight due with respect thereto, provided that the volume of cargo remaining on board is pumpable as determined by an independent surveyor." Charterer claims that, even if Shipowner has fulfilled its discharge obligations, no freight is owing because the deductions permitted under the Charter Party more than offset the amount of freight earned. *See* Defendant's Answering Brief at 21 (Dkt. No. 8). Shipowner, relying on two certificates from independent surveyors certifying that the cargo remaining on board is unpumpable, argues that no deduction is warranted. *See* Plaintiffs' Brief in Support of Their Motion to Direct Defendant to Pay Freight Due at 7–8 (Dkt. No. 10). The Court does not decide this issue at this time. However, the Court notes that, by letter dated February 22, 1984, plaintiffs' counsel has indicated that the underwriters have agreed to post full security for any pumpable cargo remaining on board the vessel. If this is the case, then any dispute over freight deduc-

tions for alleged pumpable cargo should not delay full payment of freight once Shipowner has fulfilled its delivery obligations under the Charter Party.

**6.** This action is related to a number of other actions commenced in this District, the District of New Jersey, and the Eastern District of Pennsylvania. *See* Defendant's Answering Brief at 1 (Dkt. No. 8).

**7.** The Charter Party provides that its construction, validity and performance are to be governed by English Law. *See* Clause 48. While most of the authorities cited by the Court in this Opinion are decisions by American courts, the Court notes that English and American law do not differ on the matters addressed in this Opinion and that the American authorities cited often rely on English precedents. In any event, the parties have agreed to the application of American law and have waived Clause 48. *See* Exhibit E to Defendant's Answering Brief (Dkt. No. 8).

(S.D.N.Y.1961) (freight is an independent covenant and payable regardless of damage to cargo). *See generally Aries Tanker Corp. v. Total Transport, Ltd.,* 2 Lloyd's Rep. 256 (1976). If there was no proper delivery, then freight is not due and payable until Shipowner completes its obligations of delivery under the terms of the Charter Party.

█ Both parties agree on the general principle that, in the absence of any contractual agreement to the contrary, freight is not due and payable unless and until the goods are delivered to the destination nominated by Charterer. *Alcoa S.S. Co. v. U.S.,* 338 U.S. 421, 422, 70 S.Ct. 190, 191, 94 L.Ed. 225 (1949); *The Harriman,* 76 U.S. 161 (9 Wall) 19 L.Ed. 629 (1869); *U.S. v. Waterman S.S. Corp.,* 397 F.2d 577, 578 (5th Cir.1968); *Amoco Transport Co. v. S/S Mason Lykes,* 550 F.Supp. 1264, 1271 (S.D.Tex.1982); *Trans-Oceanic Peace Corp. v. India Supply Mission,* 325 F.Supp. 474, 476 (S.D.N.Y.1971). The parties also agree that the destination nominated by Charterer in this case was Seaview Petroleum Terminal in Paulsboro, New Jersey. However, the parties cannot agree on whether Shipowner's obligations to deliver the cargo to that destination have been fulfilled.

In arguing that Shipowner has failed to fulfill its delivery obligations, Charterer relies primarily on Clauses 4 and 7 of the Charter Party. Clause 7 provides, *inter alia,* that "Freight shall be payable immediately telegraphically after completion of discharge." Clause 4 provides, *inter alia,* that the vessel shall be discharged at any berth ordered by Charterer. Charterer concludes that, since discharge of the cargo at the nominated berth has not been completed, the terms of the Charter Party have not been met and no freight is due.

Shipowner responds by placing primary reliance on Paragraph 11 of the Bills of Lading and claiming that the language in the Bills of Lading, as well as the terms of the Charter Party, should be considered in determining liability for freight. Paragraph 11 provides, *inter alia,* that:

Discharge may commence without previous notice. If the goods are not taken delivery of by the receiver from alongside the vessel without delay, or if the receiver refuses to take delivery of the goods, or in case there are unclaimed goods, the carrier shall be at liberty to land such goods on shore or at any other proper places at the sole risk and expense of the shipper or receiver, and the carrier's responsibility of delivery shall be deemed to have been fulfilled.

*See* Exhibits B and C attached to Plaintiffs' Brief in Support of Their Motion to Direct Defendant to Pay Freight Due (Dkt. No. 10). Under Paragraph 11, it seems clear that if Seaview Terminal refused to take delivery of the cargo and Shipowner was in no way at fault, Shipowner was free to take the cargo and discharge it in the Publicker Terminal and in this way fulfill its obligations of delivery. Thus Shipowner concludes that its delivery obligations have been met and freight is therefore due.

█ The Court, however, cannot conclude that Shipowner has met its delivery obligations because the Court does not believe that the Bill of Lading's provisions should control the determination of Shipowner's right to receive freight. The general rule is that, when a vessel is under charter, the Bill of Lading's provisions are not contractual; the contract of carriage being the Charter Party alone. *See generally* 2A Benedict on Admiralty § 34 at 4–13 (7th ed. 1983); 1 Carver, Carriage By Sea, § 699 at 514 (13th ed. 1982). Certainly, in a dispute between a shipowner and a charterer, language in a bill of lading cannot alter or modify the terms of the voyage charter party already entered into by the parties, absent some express provision to the contrary. *See Hellenic Lines, Ltd. v. Embassy of Pakistan,* 467 F.2d 1150, 1154 (2d Cir.1972) ("To hold that language in the bill of lading prevails over inconsistent language in the freight contract would permit [the shipowner] to change unilaterally the terms of an already existing contract."); *Romano v. West India Fruit & Steamship Co.,* 151 F.2d 727, 730 (5th Cir.1945) (bill of

lading issued after contract is merely a receipt and cannot alter or affect shipowner's liability); *Unterweser Reederei Aktiengesellschaft v. Potash Imp. Corp.*, 36 F.2d 869, 870 (5th Cir.1930) ("The bill of lading, which operated as a receipt for the goods and as a document of title, did not have the effect of varying the contract between the shipper and the shipowner, evidenced by the charter party."). In this case, there was no provision in the Charter Party incorporating the terms of the Bills of Lading or providing that language in the Bills of Lading was to take precedence over the terms of the Charter Party. In fact, Clause 28 of the Charter Party provides that "Bills of Lading are to be signed as Charterers direct, without prejudice to this charter." Moreover, typewritten on the face of each Bill of Lading is the phrase "Freight payable as arranged"; a clear indication that the arrangements in the Charter Party were to determine any questions regarding the payment of freight. Since there is nothing in this case to indicate that the parties intended or provided for language in the Bills of Lading to modify or alter the terms of the Charter Party, the Charter Party should be considered as the contract of carriage and the liability of Charterer to pay freight should be determined on the basis of the terms of the Charter Party alone.

■ The Charter Party expressly provides that freight is due and payable only upon the completion of discharge of the cargo at the berth nominated by Charterer. *See* Clauses 4, 7 of the Charter Party. Under the terms of the Charter Party and under general maritime law, the conveyance and delivery of the cargo to the nominated destination is a condition precedent to Shipowner's right to recover freight, absent some voluntary acceptance of or

agreement to delivery at an intermediate port or some circumstances frustrating or making impossible delivery to the nominated destination. *See Trans-Oceanic Peace Corp. v. India Supply Mission*,[8] 325 F.Supp. 474, 476–77 (S.D.N.Y.1971) (rule that freight is not due until the cargo is delivered to its destination does not apply where shipper voluntarily accepts delivery at intermediate port, or expressly assumes risk that delivery of goods to their prescribed destination may prove impossible, or makes a separate agreement with shipowner for other disposition of goods); *Richard Constr. Co. v. Monongahela & Ohio Dredging Co.*, 284 F.Supp. 290, 295 (W.D.Pa.1968), *modified* 407 F.2d 1170 (3d Cir.1969) (in absence of voluntary acceptance of cargo by shipper at another destination, conveyance and delivery of cargo is condition precedent to demand for freight).

Here, construing the inferences from the facts against Shipowner, there was no voluntary acceptance of the cargo by Charterer at another destination that could have altered Shipowner's responsibility to deliver the oil to Seaview Terminal. In fact, there is evidence that Charterer refused to nominate the berth at Publicker Terminal and expressly informed Shipowner that discharge into the Publicker Terminal would not be construed as a delivery for the purpose of determining when freight was due. *See* Exhibit D to Defendant's Answering Brief (Dkt. No. 8). Thus, the Court cannot rule as a matter of law that Charterer agreed to or accepted the discharge of the oil into Publicker Terminal in satisfaction of Shipowner's delivery obligations.

■ Nor can the Court rule as a matter of law that there was any frustration or impossibility of performance sufficient to justify discharge of the cargo at a place not nominated by the Charterer. First, Char-

---

**8.** In a footnote, the *Trans-Oceanic* court relies, *inter alia*, on Carver, Carriage of Goods By Sea, 781 (10th ed. 1965):

The claim for freight, when the goods have been given up by the shipowner short of their destination, must rest upon a new contract, either expressly made, or to be inferred from the conduct of the parties. No such inference can be drawn unless the goods and their proceeds have been accepted voluntarily, and in such a way as to show that the further carriage by the shipowner was intentionally dispensed with.

*Trans-Oceanic Peace Corp. v. India Supply Mission, supra,* at 477, fn. 8.

terer alleges and there is some evidence to suggest that the failure to complete discharge of the cargo at Seaview Terminal was Shipowner's fault. *See* Defendant's Answering Brief at 9–11. Under the terms of the Charter Party, Shipowner was responsible for any delay and expenses resulting from the vessel's failure to perform. This responsibility included situations where the vessel was forced to withdraw from a berth because of any failure to maintain the proper temperature or pumping pressure. *See* Clauses 11, 32, 67, 76 of the Charter Party. Thus, if withdrawal from Seaview Terminal was due to the vessel's failure to perform, there can be no argument that there was any frustration or impossibility of performance sufficient to justify discharge of the cargo into Publicker Terminal. Frustration of performance cannot be the result of default by one of the parties. *See Amoco Transport Co. v. S/S Mason Lykes,* 550 F.Supp. 1264, 1272 (S.D.Tex.1982); *Merchant Corp. of America v. Nine Thousand Six Hundred Fifty-Six Long Tons, More or Less, of No. 2 Yellow Milo,* 238 F.Supp. 572, 574 (S.D. Tex.1965); *The Louise,* 58 F.Supp. 445, 448 (D.Md.1945).

Second, even if the failure to complete discharge of the cargo at Seaview Terminal was not the fault of Shipowner, Shipowner could still have performed after it left its berth by discharging all the remaining oil into a barge and having the barge take the oil to Seaview. In fact, Shipowner attempted to perform in this manner and was prevented from completing discharge into the barge apparently because of the failure of the ship's generators and the decrease in the inert gas level of the cargo tanks. *See* Exhibit C to Defendant's Answering Brief (Dkt. No. 8). Again, if the failure to perform Shipowner's discharge obligations was the result of any malfunctioning of the vessel, then the doctrine of frustration or impossibility of performance does not apply. Moreover, Shipowner has made no showing that the increased delay and expense in obtaining another barge to transport the oil to Seaview Terminal is so "extreme and unreasonable" as to frustrate or make impossible performance of its discharge obligations. *See American Trading & Pro. Corp. v. Shell Int'l. Mar., Ltd.,* 453 F.2d 939, 942 (2d Cir.1972) (mere increase in cost is not a sufficient excuse for non-performance, absent proof that it is "extreme and unreasonable" expense); *Transatlantic Financing Corp. v. U.S.,* 363 F.2d 312, 319 (D.C.Cir.1966) (where contract price was $305,842.92 and additional cost was $43,972.00 and where 10,000 mile voyage was extended approximately 3,000 miles, there was not sufficient variation between expected cost and cost of performance to justify relief under doctrine of impossibility). Therefore, the Court cannot rule as a matter of law that the Shipowner's performance of its obligation to deliver the oil to Seaview Terminal was frustrated or made impossible.

█ Since there are no circumstances which would justify the Shipowner's delivery of the oil to a destination other than the one nominated by the Charterer, and since the terms of the Charter Party clearly provide that freight is not payable until the completion of discharge at the berth nominated by the Charterer, the Court denies plaintiffs' motion.

An Order will be entered consistent with this Opinion.

## ON RENEWED MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Presently before the Court in this case is plaintiffs' renewed Motion for Summary Judgment seeking freight due on a voyage from Dairen, China to Seaview Petroleum Terminal in Paulsboro, New Jersey. The Court previously denied plaintiffs' motion on the ground that plaintiffs had failed to complete their delivery obligations under the terms of the voyage charter party (hereinafter "Charter Party") agreed to by plaintiffs and defendants. *See Greenstone Shipping Co., S.A. and A. Halcoussis & Co. v. Transworld Oil, Ltd.,* 588 F.Supp. 574, 584–587 (D.Del.1984). Following

the Court's Opinion, plaintiffs completed delivery and renewed their demand upon defendant for the freight due. When defendant still refused to pay, plaintiffs filed the present motion. For the reasons discussed below, the Court grants the Motion for Summary Judgment and orders defendant to pay freight in the amount of $1,294,031.10.

The facts of this case have been discussed in the Court's previous Opinion and, rather than repeat them here, the Court will simply state briefly those facts that are relevant to the arguments before the Court on this motion. The plaintiffs, Greenstone Shipping Company, S.A. and A. Halcoussis & Company (hereinafter "Shipowner"), and the defendant, Transworld Oil, Ltd. of Hamilton, Bermuda (hereinafter "Charterer"), entered into a voyage charter party on August 25, 1983 for a voyage by the vessel M/T YPATIANNA with a cargo of Daquing crude oil from Dairen, China to a safeport on the Atlantic or Gulf Coast of the United States. Pursuant to the terms of the Charter Party providing Charterer with the right to nominate the discharge berth, Charterer nominated Seaview Petroleum Terminal in Paulsboro, New Jersey. *See* Clauses 4, 23 and 27 of the Charter Party, Exhibit A to Defendant's Answering Brief (Dkt. No. 8). Also pursuant to the terms of the Charter Party, Charterer elected to route the vessel around the Cape of Good Hope rather than through the Suez Canal. *See* Clause 79 of the Charter Party.

After loading,[1] the vessel departed from Dairen on September 21, 1983. The voyage was a difficult one, with a variety of alleged problems resulting in delay. The alleged problems included engine breakdowns, power failures, blackouts, fires, and a number of stops to take on supplies of fresh water because the heating coils used to heat the cargo were leaking. *See* Defendant's Answering Brief at 5–8 (Dkt. No. 8). In addition to the problems mentioned above, Charterer claims that the crew was replaced several times, the Chief Engineer was fired for incompetence and the Master failed to look at the sailing instructions until it was too late and proceeded through the Suez Canal rather than around the Cape of Good Hope.[2] *See id.* at 6–8. In any event, the ship did not arrive at Big Stone Beach Anchorage in Delaware Bay until December 15, 1983. Discharging of the cargo into barges in order to lighten the vessel so that it could proceed upriver commenced on December 26, 1983 and ended on December 29, 1983. The ship left Big Stone Beach Anchorage on December 30, 1983 and shortly thereafter ran aground. After additional lightering by barge, the ship got off the bottom and returned to Big Stone Beach Anchorage.[3] On January 3, 1984, the ship departed for Seaview Terminal and, upon arrival, commenced discharging the oil into the Terminal.

Discharge of the oil at Seaview could not be completed within the time alloted by the Terminal because of various alleged problems and the ship, under protest, left the Terminal with a substantial amount of oil remaining on board.[4] On January 8, 1984, the ship proceeded to a berth at Pier 96 South in Philadelphia. No further discharge of the oil occurred until January 27, 1984, after Shipowner arranged to have a barge come alongside the ship to take the

---

**1.** According to the bills of lading, a total of 699,934.49 barrels of oil were loaded in Dairen at 20° Celsius. When converted to 60° Fahrenheit, the total loaded in Dairen amounted to 697,054.06 barrels. *See* Affidavit of Bernard Oudijk (Dkt. No. 17).

**2.** Charterer concludes that a voyage that should have taken a maximum of fifty days if the vessel had proceeded at the average speed of 12.5 knots as required by the Charter Party, *see* Clause 71 of the Charter Party, ended up taking approximately 86 days. *See id.* at 7.

**3.** The total discharge of oil into barges from December 26, 1983 to January 1, 1984 was 255,551.1 barrels. The total amount of oil from these barges received by Seaview Petroleum Terminal was 253,179.69 barrels. *See* Affidavit of Bernard Oudijk (Dkt. No. 17).

**4.** The total discharge of oil from the ship into Seaview Terminal as of January 8, 1984 was 387,078.95 barrels according to the vessel's figures and 386,624.14 according to Seaview's figures. *See* Affidavit of Bernard Oudijk (Dkt. No. 17).

remainder of the oil to Seaview Terminal. However, after discharge of 18,928.12 barrels of oil into the barge,[5] the ship's generators failed, resulting in a decrease in the inert gas level of the cargo tanks. The U.S. Coast Guard ordered discharge operations to cease until the required level was restored. *See* Exhibit C to Defendant's Answering Brief (Dkt. No. 8). After the Coast Guard order, discharge was not resumed and the barge left for Seaview Terminal.

On January 31, 1984, Shipowner requested permission to move the ship from Pier 96 South to the Publicker Terminal at Pier 106 South and to discharge the oil remaining on Board into a shore tank. Charterer agreed to let the vessel move but expressly reserved its right to dispute whether delivery of the remaining oil to the Publicker Terminal satisfied its delivery obligations under the Charter Party. *See* Exhibit D to Defendant's Answering Brief (Dkt. No. 8). On February 3, 1984, the ship discharged 36,871.26 barrels of oil[6] into the Publicker Terminal, leaving 5081.1 barrels of oil on board which have been certified as unpumpable by two independent marine surveyors.[7] *See* Exhibits D and E to Plaintiffs' Motion For An Order For The Payment Of Freight (Dkt. No. 4). After discharge into the Publicker Terminal, Shipowner telexed Charterer, requesting payment of freight in the amount of $1,294.031.10. When Charterer refused to pay, Shipowner filed its Motion For An Order For The Payment Of Freight.

On February 29, 1984, the Court denied the motion, concluding that freight was not payable until the completion of discharge

at the berth nominated by the Charterer. *See Greenstone Shipping Co., S.A. and A. Halcoussis & Co. v. Transworld Oil, Ltd.,* supra, at 587. Following the Court's denial of its motion, Shipowner, on March 6, 1984, transferred the oil in the Publicker Terminal to Seaview Terminal in order to complete its discharge obligations under the Charter Party. Assuming that there could be no dispute that its discharge obligations had been completed, Shipowner again requested payment of freight. Again, Charterer refused to pay, although the refusal to pay was based on several grounds that had not been previously asserted. The result of Charterer's refusal was the renewal of plaintiffs' motion seeking payment of freight.

Charterer essentially makes two arguments in support of its assertion that there are material issues of fact which preclude granting Shipowner's Motion for Summary Judgment. First, Charterer argues that it is entitled to make deductions from freight on the basis of its claims of cargo damage, contamination, short delivery and pumpable cargo remaining on board. Second, Charterer argues that, if there was an unreasonable deviation, Shipowner has forfeited his contractual right to freight and Charterer is entitled to set off any cargo losses or damages against any quantum meruit recovery of freight the Shipowner is entitled to. *See* Defendant's Answering Brief (Dkt. No. 21). The Court finds Charterer's arguments to be unpersuasive and accordingly grants Shipowner's Motion for Summary Judgment.

5. Of the 18,928.12 barrels of oil discharged into the barge, 18,506.27 barrels were received by Seaview Terminal according to the Terminal's figures. *See* Affidavit of Bernard Oudijk (Dkt. No. 17).

6. This represents the ship's measurement. The Publicker Terminal's measurement of the discharge indicated the amount was 36,859.31 barrels. *See* Affidavit of Bernard Oudijk (Dkt. No. 17).

7. Charterer disputes the findings of the marine surveyors, claiming that there are approximately 8,135 barrels of oil remaining on board

which are pumpable. Charter concludes that since the remaining oil is pumpable, Clause 55 of the Charter Party permits a deduction from freight. *See* Defendant's Answering Brief at 21 (Dkt. No. 8). This issue will be addressed at a later stage of this Opinion. Charterer also claims that, including the 8,135 barrels remaining on board, there is an unaccounted for shortage of 22,683 barrels of oil which should be deducted from freight. *See* Defendant's Answering Brief at 22 (Dkt. No. 21); Affidavit of David Hall (Dkt. No. 28).

## DISCUSSION

### A. CHARTERER IS NOT ENTITLED TO ANY DEDUCTIONS FROM FREIGHT.

In considering plaintiff's Motion for Summary Judgment, the Court will first discuss the issue of whether Charterer is entitled to any deductions from freight for cargo damages, shortage or contamination, and then consider the issue of whether any alleged unreasonable deviation by Shipowner precludes the recovery of freight. In determining these issues, the Court will resolve any doubt as to the existence of genuine issues of fact against Shipowner and resolve any reasonable inferences from the facts in favor of Charterer since this is Shipowner's Motion for Summary Judgment. *See, e.g., Hollinger v. Wagner Mining Equipment Co.*, 667 F.2d 402, 405 (3d Cir.1981).

As stated in this Court's previous Opinion:

> The central issue in determining whether plaintiffs are entitled to freight as a matter of law is whether plaintiffs, as Shipowners, have fulfilled their obligation of delivery to the destination nominated by defendant, as Charterer, under the terms of the Charter Party. If there was a proper delivery, then freight is due and payable, regardless of any claims Charterer may have for shortage or cargo damage. (cites omitted).

*See Greenstone Shipping Co., S.A. and A. Halcoussis & Co. v. Transworld Oil, Ltd., supra,* at 578. Since Shipowner has now delivered the remaining oil from the Publicker Terminal to Seaview Terminal, Charterer's previous arguments based on Shipowner's failure to fulfill its obligations of delivery to the destination nominated by Charterer are no longer viable. Instead, Charterer now claims that it is entitled to deduct a loss of 22,684 barrels of oil valued at $641,957.20 and additional losses chargeable to Shipowner's Account from freight. *See* Defendant's Answering Brief at 16–25 (Dkt. No. 21). Charterer claims that these deductions are proper under the terms of

the Charter Party and under general maritime law. The Court disagrees.

The American and English authorities universally hold that the liability of a Charterer to pay freight is an independent obligation payable regardless of any claims the Charterer may have for cargo damage, shortage, or contamination. *See The Olympic Brilliance,* 21 Ll.L.R. 177, 177–78 (1981) ("[I]t has been for a long time clear law that a shipowner is entitled to his freight without deduction and, notwithstanding that a charterer may have powerful counterclaims, they are matters which must be dealt with thereafter. He is not entitled to set them off against the freight."); *The Aries,* 1 Ll.L.R. 334, 341 (1977) ("no defense of breach of contract or equitable defense or set-off can operate to diminish or extinguish a claim for freight."); *Compagnie DiNavigazione Mauritius Rome v. Kulukundis,* 182 F.Supp. 258, 263 (E.D.N.Y.1959), *aff'd.,* 277 F.2d 161 (2d Cir.1960) (liability to pay freight not discharged because of failure to deliver cargo in good condition); *Compania Naviera Puerto Madren S.A. Panama v. Esso Standard Oil Co.,* 1962 A.M.C. 169, 170 (S.D.N.Y.1961) (freight is an independent covenant and payable regardless of cargo damage). *See generally* 2 Carver, Carriage By Sea, §§ 1669–71, 1724–26 at 1169–70, 1209–11 (13th ed. 1982) (freight payable notwithstanding claims for cargo damage and shortage and there is no right to set off damage or shortage claims against payment of freight). The reason for this rule is perhaps obvious but it is nonetheless important: The rule protects and promotes the commercial viability of shipping enterprises by allowing a shipper to collect his freight immediately upon delivery rather than after lengthy delay and litigation over whether a cargo owner is entitled to deduct his claims for damage or shortage from freight. A rule to the contrary would require a shipper to bear the risk and expense of carrying cargo to its destination without any assurance that the risk and expense undergone would be compensated at all and would allow a cargo owner to withhold freight by simply raising

a damage or shortage claim. In this case, to allow Charterer to withhold payment of freight because of any claims for cargo damage, shortage or contamination would defeat the purpose of a well-established rule of law and would seriously undermine the commercial viability of not only the shipowner in this case, but of shipping enterprises everywhere. Therefore, unless there are explicit and clear provisions in the Charter Party permitting deductions from freight, Shipowner is entitled to freight regardless of Charterer's claims for cargo damage, shortage and contamination.

■ Charterer argues that there are provisions in the Charter Party which either implicitly or explicitly permit deductions from freight. First, Charterer relies on Clause 6 of the Charter Party to support its claim that it is entitled to deduct 22,694 barrels of oil valued at $641,957.20 from freight as an abnormal and unexpected loss. Second, Charterer relies on a number of clauses, including Clauses 11, 13, 32 and 67, to support its claims that it is entitled to deduct any amounts chargeable to Shipowner's account from freight. Finally, Charterer relies on Clauses 7, 55 and 65 to support its argument that it is entitled to make the deductions explicitly provided for in those Clauses. None of these clauses support Charterer's arguments.

Clause 6 provides that "the rate of freight shall be at the level of 40% of the rate for the voyage as provided in Worldscale, as amended at the date of this Charter, per ton of 2,240 lbs. of cargo without deduction for normal or expected losses." Charterer argues that this clause implies that abnormal or unexpected losses can be deducted from freight and that, since a loss of 22,694 barrels of oil is abnormal and unexpected, it can be deducted under Clause 6. This interpretation of Clause 6 is completely unreasonable in light of the fact that, when the parties intended to permit deductions from freight, they explicitly said so in other clauses of the Charter Party. *See* Clauses 7, 55 and 65. Moreover, such a contractual interpretation is completely counter to the general rule of

law refusing to allow a cargo owner to deduct his claims of damage or shortage from freight. Therefore, Clause 6 does not support Charterer's claim that it is entitled to deduct its alleged loss of 22,694 barrels of oil from freight.

Clauses 11, 13, 32 and 67 delineate expenses chargeable to Shipowner's account. Clause 11 provides that expenses due to the deficient or improper operation of the inert gas system are for Shipowner's account. Clause 13 provides that any expenses imposed by a berth owner for prolonged occupation of the berth for reasons beyond the Charterer's control are for Shipowner's account. Clause 32 provides that any expenses incurred as a result of the Shipowner's failure to maintain the proper temperature of the cargo and the withdrawal of the vessel from the berth are for Shipowner's account. Clause 67 provides that any expenses incurred as a result of the Shipowner's failure to maintain the proper pumping pressure and discharge rate are for Shipowner's account. Charterer claims that these clauses require any amount chargeable to Shipowner's account to be deducted from freight. Again, this argument is unreasonable in light of the fact that, when the parties intended to permit deductions from freight, they explicitly said so in other clauses of the Charter Party. Here, there is nothing in the Charter Party to even suggest that amounts chargeable to Shipowner's account should be deducted from freight and there is nothing in the general maritime law which suggests that such deductions from freight should be implied in the absence of an express contractual provision permitting the deduction. Therefore, any claims for deductions based on any of the clauses providing that certain expenses are for Shipowner's account are without merit.

Clauses 7, 55 and 65, in contrast to the clauses discussed above, expressly permit deductions from freight. Clause 7 provides:

Freight shall be payable telegraphically immediately after completion of discharge. Payment shall be made in US

dollars to Williams & Glyns Bank PLC, 61 Akti Miaouli, Piraeus/Greece credit: A. Halcoussis & Co., Piraeus without discount, less any disbursements or advances made to the Master or agents at ports of loading and/or discharge, and any additional cargo insurance premium for Owners' account under Clause 36 hereof, provided that no freight shall be payable on any quantity which submerges, at any stage of the voyage, the marks appropriate under the International Load Line Convention, 1966, or any modification or amendment thereof as may be applicable to the voyage to be performed under this Charter.

Clause 55 provides:

### Cargo Retention

In the event that any cargo remains on board upon completion of final discharge, Charterers shall have the right to deduct from freight an amount equal to the FOB port of loading value of such cargo plus freight due with respect thereto, provided that the volume of cargo remaining on board is pumpable as determined by an independent surveyor. Any action or lack of action in accordance with this provision shall be without prejudice to any rights or obligations of the parties.

Clause 65 provides:

### Bunker

Owners agree to give Charterers first refusal to supply bunkers for the voyage provided Charterers, or their nominated Company, can supply suitable quality and at competitive prices.

Owners will give Charterers an opportunity to match prices of competitors, and Charterers shall respond within two working days and advise their ability to supply at price advised.

Payment of bunkers placed on board shall be deductible from freight, but if vessel becomes lost, Owners agree to promptly pay by telegraphic transfer against telexed bill.

With respect to these three clauses, Charterer claims that it is entitled to deduct the amounts specified from freight. The Court agrees that Charterer is explicitly entitled to make certain deductions from freight under these clauses; however, the Court finds that Charterer has produced no affirmative evidence to support its claimed deductions under these clauses.

With respect to Clause 7, there is no evidence that there have been "any disbursements or advances made to the Master or agents at ports of loading and/or discharge, and any additional cargo insurance premium for owner's account under Clause 36" and counsel have made no allegation that they are entitled to any such deduction. Nor has there been any contention or evidence suggesting that the vessel's marks were submerged; so no deduction from freight can be made on that basis. Thus, Charterer has produced no affirmative evidence to suggest that any deduction under Clause 7 is warranted.

With respect to Clause 55, Charterer has submitted evidence suggesting that there are 8,135 barrels of oil remaining on board. *See* Affidavit of David Hall (Dkt. No. 28). Charterer contends that this evidence raises a genuine issue of fact by contradicting the evidence submitted by Shipowner indicating that there are only 5,081.1 barrels of unpumpable cargo remaining on board. *See* Affidavit of Bernard Oudijk (Dkt. No. 18); Exhibits D and E to Plaintiffs' Motion For An Order For The Payment Of Freight (Dkt. No. 4). The Court disagrees. Clause 55 permits a deduction from freight only if the "cargo remaining on board is *pumpable* as determined by an independent surveyor." Here, the Affidavit of David Hall (Dkt. No. 28), who is Charterer's surveyor, does not contradict or refute the Affidavit of Bernard Oudijk and the certificates of unpumpability filed by two independent marine surveyors on the issue of pumpability. Hall's Affidavit simply states that his calculations reveal that there are 8,135 rather than 5081.1 barrels remaining on board; it does not state that the oil remaining on board is pumpable. Indeed, insofar as Hall's Affidavit sheds any light at all on

the issue of pumpability, it suggests that the cargo remaining on board is indeed unpumpable. *See* Exhibit C to Affidavit of David Hall (Dkt. No. 28) (letter of protest describing cargo remaining on board as "solid"). Therefore, since Charterer has produced no evidence to contradict or refute Shipowner's evidence of unpumpability, any deduction under Clause 55 is unwarranted.[8]

Finally, with respect to Clause 65, there is no evidence or any allegation that Charterer has paid for any bunkers. Charterer has simply alleged that some of the cargo was commingled with bunkers and that, therefore, it is entitled to a deduction from freight. However, Clause 65 does not address the issue of cargo commingling with bunkers; it simply provides that any bunkers paid for by the Charterer may be deducted from freight. Charterer's claim of commingling is essentially a claim for contamination; as such it is not entitled to be deducted from freight. Therefore, no deduction under Clause 65 is warranted.

Since none of the claims made by Charterer for deductions from freight are supported by the terms of the Charter Party and the evidence, and since the general maritime law forbids Charterer from setting off his claims of cargo damage, shortage and contamination against his liability

to pay Shipowner freight, the Court completely rejects Charterer's arguments on this issue.

## B. ANY ALLEGED DEVIATION DOES NOT PRECLUDE SHIPOWNER'S RECOVERY OF FREIGHT.

In addition to the argument relating to deductions from freight, Charterer also argues that Shipowner's unreasonable deviation[9] abrogates the Charter Party and makes Shipowner liable as an insurer for any cargo losses and damages sustained. Charterer further argues that an unreasonable deviation causes the Shipowner to forfeit his contractual right to freight and forces Shipowner to seek compensation for the carriage on the basis of quantum meruit. Charterer concludes that, even if Shipowner is entitled to a reasonable rate of freight under a quantum meruit theory of recovery, claims for cargo losses and damages can then be set off against freight.

 The Court agrees with Charterer that, if there was an unreasonable deviation, the Charter Party may be abrogated at the option of the Charterer and the Shipowner will be liable as an insurer for any cargo damages or losses sustained.[10] *See The Malcom Baxter*, 277 U.S. 323, 48 S.Ct. 516, 72 L.Ed. 901 (1928); *The Will-*

---

**8.** As this Court has previously noted, Shipowner has agreed to post an underwriter's irrevocable letter of guarantee covering 8135 barrels of oil, including the freight refundable thereon, in the total amount of $243,000 to protect Charterer if, at a later trial on cargo damage or shortage, the oil remaining on board is identified as cargo determined to be unpumpable by reason of deficient heating. This promise of full security pending resolution of this issue makes any dispute over deductions from freight under Clause 55 particularly inappropriate.

**9.** A deviation has been traditionally defined to be a voluntary departure, without necessity or reasonable cause, from the regular and usual course of the voyage. *See generally* 2A Benedict on Admiralty § 122 at 12–3 (7th ed. 1983). Recently, some courts have expanded the concept of deviation to include situations where no change of route is involved, on the theory that various forms of misconduct of the carrier are so serious as to amount to a departure from the whole course of the contract. *See generally*

Gilmore & Black, The Law of Admiralty, § 3–42 at 182–83 (2d ed. 1975). In this case, Charterer apparently alleges both geographical and non-geographical types of deviation.

**10.** There is a split of authority as to whether such damage must be causally related to the deviation. *See, e.g., U.S.A. v. Orient Mid-East Lines*, 1972 A.M.C. 953, 962 (S.D.N.Y.1972) (46 U.S.C. § 1304(4) implies that a deviation does not make the carrier liable as an insurer, but rather makes it liable only for those damages actually caused by the deviation); *World Wide Steamship Co. v. India Supply Mission*, 316 F.Supp. 190, 192 (S.D.N.Y.1970) (court appears to assume that deviation must be causally connected to loss sought to be averaged). *See generally* Gilmore & Black, The Law of Admiralty, § 3–41 at 180–182 (2d ed. 1975) ("Certainly, a construction is appealing which would abolish the drastic effect of deviation, leaving the carrier liable for damages caused by the undoubted breach of duty involved."). The Court does not decide this issue at this time.

*domino,* 272 U.S. 718, 47 S.Ct. 261, 71 L.Ed. 491 (1927); *St. Johns N.F. Shipping Corp. v. S.A. Compantria Geral Commercial,* 263 U.S. 119, 44 S.Ct. 30, 68 L.Ed. 201 (1923); *General Elec. Co. Intern. v. S.S. Nancy Lykes,* 706 F.2d 80, 83 (2d Cir.1983); *Nemeth v. General Steamship Corp.,* 694 F.2d 609, 612 (9th Cir.1982); *Jones v. The Flying Clipper,* 116 F.Supp. 386, 387 (S.D.N.Y.1953). *See generally* 2A Benedict on Admiralty § 121 at 12–1 (7th ed. 1983); 2 Carver, Carriage By Sea §§ 1189–1199 at 881–887 (13th ed. 1982). The Court also agrees with Charterer that the issue of unreasonable deviation is a question of fact which must be determined from an evaluation of all the circumstances of the case as they existed at the moment of deviation. *See, e.g., General Elec. Co. Intern. v. S.S. Nancy Lykes,* 706 F.2d 80, 85 (2d Cir.1983); *U.S.A. v. Orient Mid-East Lines, Inc.,* 1972 A.M.C. 953, 963, fn. 16 (S.D.N.Y.1972). *See generally The Ixia* [1932] A.C. 328, 343–44 ("The true test seems to be what departure from the contract voyage might a prudent person controlling the voyage at the time make and maintain, having in mind all the relevant circumstances existing at that time, including the terms of the contract and the interests of all parties concerned, but without obligation to consider the interests of any one as conclusive."). However, the Court cannot agree that an unreasonable deviation justifies a Charterer in withholding payment of freight when the cargo has in fact been delivered to the destination nominated by the Charterer.

**11.** Charterer concedes as much in its brief by admitting that Shipowner can, at least, make a quantum, meruit claim for the recovery of freight. *See* Defendant's Answering Brief at 15 (Dkt. No. 21) ("the Shipowner may claim the existence of a quasi-contract and seek compensation for the carriage on the basis of quantum meruit."). Shipowner argues that, even if there was an unreasonable deviation, a contractual right to freight is retained even though any contractual defenses to claims for cargo damage or shortage may be lost. *See* Plaintiffs' Reply Brief at 4–6 (Dkt. No. 33). The Court finds that whether Shipowner is entitled to freight on the contract or on the basis of quantum meruit in this case depends on whether Charterer exercis-

While the law in this area is not settled, and while the Court has found no American case directly on point, the cases and authorities that are relevant all suggest that a Shipowner who has actually delivered the cargo to its intended destination is entitled to some compensation for the risk and expense incurred in carrying the goods whether or not any unreasonable deviation has occurred.[11] Support for the Court's conclusion that Shipowner is entitled to some compensation for the carriage of the cargo to its intended destination even if there was an unreasonable deviation is found in the venerable case of *Thorley v. Orchis S.S. Co.,* [1907] 1 K.B. 660, 669, where Fletcher Moulton, L.J., states:

A deviation is such a serious matter, and changes the character of the voyage so essentially, that a shipowner who has been guilty of a deviation cannot be considered as having performed his part of the bill of lading contract, but something fundamentally different, and therefore he cannot claim the benefit of stipulations in his favour contained in the bill of lading. *In what position, then, does he stand? He has carried the goods to their place of destination, and is therefore entitled to some remuneration for that service, of which the owner of the goods has received the benefit. The most favorable position which he can claim to occupy is that he has carried the goods as a common carrier for the agreed freight.* I do not say that in all cases he would be entitled as of right to be treated even as favorably as this. (emphasis added).

es its option to abrogate the terms of the Charter Party. The law is clear that an unreasonable deviation does not void the contract of carriage but merely makes the contract voidable at the option of the injured party. *See generally,* 2 Carver, Carriage By Sea, §§ 1189–1194 at 881–885 (13th ed. 1982). Here, it is unclear at this point in the litigation that an unreasonable deviation has in fact occurred and, therefore, it is unclear whether Charterer has the right to declare the Charter Party abrogated. Since this issue remains undecided, the Court, for purposes of the present summary judgment motion, will assume that Shipowner's recovery of freight should be on the basis of quantum meruit.

Support is also found in 2 Carver, Carriage By Sea, § 1197 at 886 (13th ed. 1982), where it is stated:

> FREIGHT AFTER DEVIATION. As regards freight, although the question has never been judicially determined, the better view appears to be that, although the carrier is not entitled to any freight under the contract after a deviation, he may, according to the circumstances, be entitled to reasonable freight on a *quantum meruit.* It would appear to follow from the proposition that, after a deviation, the shipowner is carrying as a common carrier, that he would usually be entitled to freight on that principle.

Finally, support for the Court's conclusion is found in *Cargo & Tankship Management Corporation (Mount Evans) v. India Supply Mission and U.S.A.*, 336 F.2d 416, 418–19 (2d Cir.1964) where the Court,[12] in rejecting claims of unseaworthiness and voluntary deviation as defenses to a claim for freight, stated:

> Respondent's contention that the S.S. MOUNT EVANS was so unseaworthy when she began her ill-fated voyage that the docking at Norfolk for repairs was a voluntary deviation from her intended course, while admittedly presenting issues which can be sufficiently resolved only through a full trial, nevertheless under the circumstances of this case, is legally irrelevant to the question of respondent's liability for the claimed freight and demurrage charges and hence constituted no bar to the lower court's grant of summary judgment against respondents.

Thus, both the English and American authorities support the proposition that a carrier, even if guilty of an unreasonable deviation, is entitled to some compensation for carriage of the cargo when the cargo is in fact delivered to its intended destination.

All of the cases cited by Charterer and found by the Court that involve a denial of a shipper's contractual right to freight after an unreasonable deviation are factually distinguishable since they concern situations where the cargo was either lost or never delivered to its intended destination. *See Singapore Navigation Co., S.A. v. Mego Corp.*, 540 F.2d 39, 44 (2d Cir.1976) (unreasonable deviation precludes shipowner's counterclaims for general average contribution and for freight charges where cargo was never delivered to intended destination); *Hellenic Lines, Ltd. v. U.S.*, 512 F.2d 1196, 1209 (2d Cir.1975) (deviation entitled cargo owner to recovery of prepaid freight unless and until goods were delivered to intended destination); *Yutana Barge Lines v. Northland Services*, 574 F.Supp. 1003, 1006 (W.D.Wash.1983) (carrier's contractual right to recovery of freight forfeited by unreasonable deviation where cargo was totally lost and never delivered); *In the Matter of the Complaint of Delphinus Maritima, S.A.*, 1982 A.M.C. 796, 804–05 (S.D.N.Y.1982) (cargo claimant entitled to recover prepaid freight when carrier unreasonably deviated and, as a result, cargo was totally lost and voyage abandoned); *The Louise*, 58 F.Supp. 445, 449–50 (D.Md. 1945) (where unreasonable deviation prevented completion of voyage, shipowner was not entitled to retain prepaid freight). Here, by contrast, the cargo was delivered to its intended destination and Shipowner is entitled to some compensation for its carriage.

Even if that compensation is based on a quantum meruit recovery rather than on the terms of the voyage Charter Party, the Court fails to see how Shipowner would be entitled to anything less than the amount of freight agreed to in the Charter Party. The Court is willing to assume, *arguendo*, that Charterer has exercised its option to abrogate the terms of the Charter Party because of Shipowner's alleged unreasonable deviation and has thereby eliminated Shipowner's contractual right to re-

---

**12.** The trial court, in its opinion reported at 221 F.Supp. 680, 684 states:

> That the vessel was unseaworthy may be some defense to a general average claim if asserted by the owner, but seems irrelevant to a claim for freight *because in fact the cargo was safely delivered to destination.* (emphasis added).

cover freight. However, even under this assumption, Shipowner is still entitled to a quantum meruit recovery equal to or greater than the $1,294,031.10 agreed to as freight for a voyage around the Cape of Good Hope. A quantum meruit recovery would be based on a reasonable amount of freight for the service of carriage actually performed by the carrier. In this case, such a reasonable amount would be based on a voyage through the Suez Canal, since that is the route the vessel actually took. Based on Worldscale calculations,[13] the freight for such a voyage would be $1,368,469.83, an amount greater than the freight requested by Shipowner under the terms of the Charter Party. *See* Affidavit of Diamandis Giannakopoulos (Dkt. No. 20). Therefore, even if Shipowner can only recover freight on a quantum meruit theory, its request for freight in the amount of $1,294,031.10 is entirely reasonable for the service of carriage it performed.

■ The Court rejects Charterer's argument that, if freight is recovered on a quantum meruit basis, Charterer is entitled to deduct claims for cargo damage, contamination, or shortage. Again, even if Shipowner is guilty of an unreasonable deviation and Charterer has exercised its option to abrogate the terms of the Charter Party, Shipowner is still entitled to recover freight as a common carrier since it delivered the goods to their intended destination and Charterer is still unable, under general maritime law, to set off its claims of cargo losses or damages against the recovery of freight. *See generally* 2 Carver, Carriage By Sea, §§ 1723–1726 at 1208–11 (13th ed. 1982). Therefore, Charterer's claim that it

can withhold freight because of any alleged unreasonable deviation is incorrect.

Because the Court finds that Charterer is not entitled to any deductions from freight under the terms of the Charter Party or under general maritime law, and because the Court finds Charterer's arguments based on unreasonable deviation to be incorrect, the Court grants plaintiffs' Motion for Summary Judgment and orders that freight be paid immediately in the amount of $1,294,031.10.

An Order will be entered consistent with this Opinion.

---

**13.** The Court, in attempting to determine how to calculate a reasonable rate of freight, has discovered that freight in some trades is fixed by certain agreed freight scales. In particular, freight for the carriage of oil is fixed on an international scale known as Worldscale (Worldwide Tanker Nominal Freight Scale). *See generally,* 2 Carver, Carriage by Sea, § 1717 at 1203 (13th ed. 1982). In this case, the parties' freight rate in the Charter Party was based on an agreed reference to 40% of Worldscale. The freight bill submitted to Charterer was calculated at Worldscale for a voyage via the Cape of Good Hope based on the weights recorded by

shippers in the bills of lading. *See* Affidavit of Diamandis Giannakopoulos (Dkt. No. 20). Charterer's counsel has conceded, at oral argument, that Shipowner's calculations are correct. Since the calculations are based on an internationally accepted freight scale and since the rate of freight was agreed to by parties who were both familiar with reasonable and standard freight rates for the carriage of oil, the Court finds that the freight due under the terms of the Charter Party constitutes a reasonable amount of freight for purposes of any quantum meruit recovery Shipowner may have.