AMERICAN TRADING AND PRODUC-
TION CORPORATION, Plaintiff-
Appellant,

v.

SHELL INTERNATIONAL MARINE
LTD., Defendant-Appellee.

No. 306, Docket 71–1837.

United States Court of Appeals,
Second Circuit.

Argued Dec. 13, 1971.

Decided Jan. 5, 1972.

Herbert M. Lord, New York City (Burlingham, Underwood, Wright, White & Lord, New York City, Frederick M. Sevekow, Jr., New York City, of counsel), for plaintiff-appellant.

MacDonald Deming, New York City (Haight, Gardner, Poor & Havens, Thomas R. H. Howarth, New York City, of counsel), for defendant-appellee.

Before SMITH, KAUFMAN and MULLIGAN, Circuit Judges.

MULLIGAN, Circuit Judge:

This is an appeal by American Trading and Production Corporation (hereinafter "owner") from a judgment entered on July 29th, 1971, in the United States District Court for the Southern District of New York, dismissing its claim against Shell International Marine Ltd. (hereinafter "charterer") for additional compensation in the sum of $131,978.44 for the transportation of cargo from Texas to India via the Cape of Good Hope as a result of the closing of the Suez Canal in June, 1967. The charterer had asserted a counterclaim which was withdrawn and is not in issue. The action was tried on stipulated facts and without a jury before Hon. Harold R. Tyler, Jr. who dismissed the claim on the merits in an opinion dated July 22, 1971.

We affirm.

The owner is a Maryland corporation doing business in New York and the charterer is a United Kingdom corporation. On March 23, 1967 the parties entered into a contract of voyage charter in New York City which provided that the charterer would hire the owner's tank vessel, WASHINGTON TRADER, for a voyage with a full cargo of lube oil from Beaumont/Smiths Bluff, Texas to Bombay, India. The charter party provided that the freight rate would be in accordance with the then prevailing American Tanker Rate Schedule (ATRS), $14.25 per long ton of cargo, plus seventy-five percent (75%), and in addition there was a charge of $.85 per long ton for passage through the Suez Canal. On May 15, 1967 the WASHINGTON TRADER departed from Beaumont with a cargo of 16,183.32 long tons of lube oil. The charterer paid the freight at the invoiced sum of $417,327.36 on May 26, 1967. On May 29th, 1967 the owner advised the WASHINGTON TRADER by radio to take additional bunkers at Ceuta due to possible diversion because of the Suez Canal crisis. The vessel arrived at Ceuta, Spanish Morocco on May 30, bunkered and sailed on May 31st, 1967. On June 5th the owner cabled the ship's master advising him of various reports of trouble in the Canal and suggested delay in entering it pending clarification. On that very day, the Suez Canal was closed due to the state of war which had developed in the Middle East. The owner then communicated with the charterer on June 5th through the broker who had negotiated the charter party, requesting approval for the diversion of the WASHINGTON TRADER which then had proceeded to a point about 84 miles northwest of Port Said, the entrance to the Canal. On June 6th the charterer responded that under the circumstances it was "for owner to decide whether to continue to wait or make the alternative passage via the Cape since Charter Party Obliges them to deliver cargo without qualification." In response the owner replied on the same day that in view of the closing of the Suez, the WASHINGTON TRADER would proceed to Bombay via the Cape of Good Hope and "[w]e [are] reserving all rights for extra compensation." The vessel proceeded westward, back through the Straits of Gibraltar and around the Cape and eventually arrived in Bombay on July 15th (some 30 days later than initially expected), traveling a total of 18,055 miles instead of the 9,709 miles which it would have sailed had the Canal been open. The owner billed $131,978.44 as extra compensation which the charterer has refused to pay.

On appeal and below the owner argues that transit of the Suez Canal was the agreed specific means of per-

formance of the voyage charter and that the supervening destruction of this means rendered the contract legally impossible to perform and therefore discharged the owner's unperformed obligation (Restatement of Contracts § 460 (1932)). Consequently, when the WASHINGTON TRADER eventually delivered the oil after journeying around the Cape of Good Hope, a benefit was conferred upon the charterer for which it should respond in *quantum meruit*. The validity of this proposition depends upon a finding that the parties contemplated or agreed that the Suez passage was to be the exclusive method of performance, and indeed it was so argued on appeal. We cannot construe the agreement in such a fashion. The parties contracted for the shipment of the cargo from Texas to India at an agreed rate and the charter party makes absolutely no reference to any fixed route. It is urged that the Suez passage was a condition of performance because the ATRS rate was based on a Suez Canal passage, the invoice contained a specific Suez Canal toll charge and the vessel actually did proceed to a point 84 miles northwest of Port Said. In our view all that this establishes is that both parties contemplated that the Canal would be the probable route. It was the cheapest and shortest, and therefore it was in the interest of both that it be utilized. However, this is not at all equivalent to an agreement that it be the exclusive method of performance. The charter party does not so provide and it seems to have been well understood in the shipping industry that the Cape route is an acceptable alternative in voyages of this character.

The District of Columbia Circuit decided a closely analogous case, Transatlantic Financing Corp. v. United States, 124 U.S.App.D.C. 183, 363 F.2d 312 (1966). There the plaintiff had entered into a voyage charter with defendant in which it agreed to transport a full cargo of wheat on the CHRISTOS from a United States port to Iran. The parties clearly contemplated a Suez passage, but on November 2, 1956 the vessel reduced speed when war blocked the Suez Canal. The vessel changed its course in the Atlantic and eventually delivered its cargo in Iran after proceeding by way of the Cape of Good Hope. In an exhaustive opinion Judge Skelly Wright reviewed the English cases which had considered the same problem and concluded that "the Cape route is generally regarded as an alternative means of performance. So the implied expectation that the route would be via Suez is hardly adequate proof of an allocation to the promisee of the risk of closure. In some cases, even an express expectation may not amount to a condition of performance." Transatlantic Financing Corp. v. United States, *supra*, 363 F.2d at 317 (footnote omitted).

Appellant argues that *Transatlantic* is distinguishable since there was an agreed upon flat rate in that case unlike the instant case where the rate was based on Suez passage. This does not distinguish the case in our view. It is stipulated by the parties here that the only ATRS rate published at the time of the agreement from Beaumont to Bombay was the one utilized as a basis for the negotiated rate ultimately agreed upon. This rate was escalated by 75% to reflect whatever existing market conditions the parties contemplated. These conditions are not stipulated. Had a Cape route rate been requested, which was not the case, it is agreed that the point from which the parties would have bargained would be $17.35 per long ton of cargo as against $14.25 per long ton.

Actually, in *Transatlantic* it was argued that certain provisions in the P. & I. Bunker Deviation Clause referring to the direct and/or customary route required, by implication, a voyage through the Suez Canal. The court responded "[a]ctually they prove only what we are willing to accept—that the parties expected the usual and customary route would be used. The provisions in no way condition performance upon non-occurrence of this contingency." Transatlantic Financing Corp. v. United States,

*supra*, 363 F.2d at 317 n. 8. We hold that all that the ATRS rate establishes is that the parties obviously expected a Suez passage but there is no indication at all in the instrument or *dehors* that it was a condition of performance.

■ This leaves us with the question as to whether the owner was excused from performance on the theory of commercial impracticability (Restatement of Contracts § 454 (1932)). Even though the owner is not excused because of strict impossibility, it is urged that American law recognizes that performance is rendered impossible if it can only be accomplished with extreme and unreasonable difficulty, expense, injury or loss.[1] There is no extreme or unreasonable difficulty apparent here. The alternate route taken was well recognized, and there is no claim that the vessel or the crew or the nature of the cargo made the route actually taken unreasonably difficult, dangerous or onerous. The owner's case here essentially rests upon the element of the additional expense involved—$131,978.44. This represents an increase of less than one third over the agreed upon $417,327.36. We find that this increase in expense is not sufficient to constitute commercial impracticability under either American or English authority.

■ Mere increase in cost alone is not a sufficient excuse for non-performance (Restatement of Contracts § 467 (1932)). It must be an "extreme and unreasonable"[2] expense (Restatement of Contracts § 454 (1932)).[3] While in the *Transatlantic* case *supra*, the increased cost amounted to an increase of about 14% over the contract price, the court did cite with approval[4] the two leading English cases Ocean Tramp Tankers Corp. v. V/O Sovfracht (The Eugenia), [1964] 2 Q.B. 226, 233 (C.A.1963) (which expressly overruled Société Franco Tunisienne D'Armement v. Sidermar S.P.A. (The Messalia), [1961] 2 Q.B. 278 (1960), where the court had found frustration because the Cape route was highly circuitous and involved an increase in cost of approximately 50%), and Tsakiroglou & Co. Lt. v. Noblee Thorl G.m.b.H., [1960] 2 Q.B. 318, 348, aff'd, [1962] A.C., 93 (1961) where the House of Lords found no frustration though the freight costs were exactly doubled due to the Canal closure.[5]

Appellant further seeks to distinguish *Transatlantic* because in that case the

1. This is the formula utilized in the Restatement of Contracts § 454 (1932).

2. The Restatement gives some examples of what is "extreme and unreasonable"—Restatement of Contracts § 460, Illus. 2 (tenfold increase in costs) and Illus. 3 (costs multiplied fifty times) (1932); compare § 467, Illus. 3. See generally G. Grismore, Principles of the Law of Contracts § 179 (rev. ed. J. E. Murray 1965).

3. Both parties take solace in the Uniform Commercial Code which in comment 4 to Section 2–615 states that the rise in cost must "alter the essential nature of the performance . . . ." This is clearly not the case here. The owner relies on a further sentence in the comment which refers to a severe shortage of raw materials or of supplies due to "war, embargo, local crop failure, unforeseen shutdown of major sources of supply or the like, which either causes a marked increase in cost . . . ." Since this is not a case involving the sale of goods but transportation of a cargo where there was an alternative which

was a commercially reasonable substitute (see Uniform Commercial Code § 2–614 (1)) the owner's reliance is misplaced.

4. Transatlantic Financing Corp. v. United States, *supra*, 363 F.2d at 319 n. 14.

5. While these are English cases and refer to the doctrine of "frustration" rather than "impossibility" as Judge Skelly Wright pointed out in *Transatlantic*, *supra*, 363 F.2d at 320 n. 16 the two are considered substantially identical, 6 A. Corbin, Contracts § 1322, at 327 n. 9 (rev. ed. 1962). While *Tsakiroglou* and *The Eugenia* are criticized in Schegal, Of Nuts, and Ships and Sealing Wax, Suez, and Frustrating Things—The Doctrine of Impossibility of Performance, 23 Rutgers L.Rev. 419, 448 (1969), apparently on the theory that the charterer is a better loss bearer, the overruled *Sidermar* case was previously condemned in Berman, Excuse for Nonperformance in the Light of Contract Practices in International Trade, 63 Colum.L.Rev. 1413, 1424–27 (1963).

change in course was in the mid-Atlantic and added some 300 miles to the voyage while in this case the WASHINGTON TRADER had traversed most of the Mediterranean and thus had added some 9000 miles to the contemplated voyage. It should be noted that although both the time and the length of the altered passage here exceeded those in the *Transatlantic*, the additional compensation sought here is just under one third of the contract price. Aside from this however, it is a fact that the master of the WASHINGTON TRADER was alerted by radio on May 29th, 1967 of a "possible diversion because of Suez Canal crisis," but nevertheless two days later he had left Ceuta (opposite Gibraltar) and proceeded across the Mediterranean. While we may not speculate about the foreseeability of a Suez crisis at the time the contract was entered, there does not seem to be any question but that the master here had been actually put on notice before traversing the Mediterranean that diversion was possible. Had the WASHINGTON TRADER then changed course, the time and cost of the Mediterranean trip could reasonably have been avoided, thereby reducing the amount now claimed. (Restatement of Contracts § 336, Comment *d* to subsection (1) (1932)).

In a case closely in point, Palmco Shipping Inc. v. Continental Ore Corp. (*The "Captain George K"*), [1970] 2 Lloyd's L.Rep. 21 (Q.B.1969), *The Eugenia, supra,* was followed, and no frustration was found where the vessel had sailed to a point three miles northwest of Port Said only to find the Canal blocked. The vessel then sailed back through the Mediterranean and around the Cape of Good Hope to its point of destination, Kandla. The distances involved, 9700 miles via the initially contemplated Canal route and 18,400 miles actually covered by way of the Cape of Good Hope, coincide almost exactly with those in this case. Moreover, in *The "Captain George K"* there was no indication that the master had at anytime after entering the Mediterranean been advised of the possibility of the Canal's closure.

■ Finally, owners urge that the language of the "Liberties Clause," Para. 28(a) of Part II of the charter party [6] provides explicit authority for

6. "28. Liberty Clauses. (a) In any situation whatsoever and wheresoever occurring and whether existing or anticipated before commencement of or during the voyage, which in the judgment of the Owner or Master is likely to give rise to risk of capture, seizure, detention, damage, delay or disadvantage to or loss of the Vessel or any part of her cargo, or to make it unsafe, imprudent, or unlawful for any reason to commence or proceed on or continue the voyage or to enter or discharge the cargo at the port of discharge, or to give rise to delay or difficulty in arriving, discharging at or leaving the port of discharge or the usual place of discharge in such port, the Owner may before loading or before the commencement of the voyage, require the shipper or other person entitled thereto to take delivery of the Cargo at port of shipment and upon their failure to do so, may warehouse the cargo at the risk and expense of the cargo; or the owner or Master, whether or not proceeding toward or entering or attempting to enter the port of discharge or reaching or attempting to reach the usual place of discharge therein or attempting to discharge the cargo there, may discharge the cargo into depot, lazaretto, craft or other place; or the Vessel may proceed or return, directly or indirectly, to or stop at any such port or place whatsoever as the Master or the Owner may consider safe or advisable under the circumstances, and discharge the cargo, or any part thereof, at any such port or place; or the Owner or the Master may retain the cargo on board until the return trip or until such time as the Owner or the Master thinks advisable and discharge the cargo at any place whatsoever as herein provided or the Owner or the Master may discharge and forward the cargo by any means at the risk and expense of the cargo. The Owner may, when practicable, have the Vessel call and discharge the cargo at another or substitute port declared or requested by the Charterer. The Owner or the Master is not required to give notice of discharge of the cargo, or the forwarding thereof as herein provided. When the cargo is discharged from the Vessel, as .

extra compensation in the circumstances of this case. We do not so interpret the clause. We construe it to apply only where the master, by reason of dangerous conditions, deposits the cargo at some port or haven other than the designated place of discharge. Here the cargo did reach the designated port albeit by another route, and hence the clause is not applicable. No intermediate or other disposition of the oil was appropriate under the circumstances.

Appellant relies on C. H. Leavell & Co. v. Hellenic Lines, Ltd., 13 F.M.C., 76, 1969 A.M.C. 2177 (1969) for a contrary conclusion. That case involved a determination as to whether surcharges to compensate for extra expenses incurred when the Suez Canal was closed after the commencement of a voyage, were available to a carrier. The Federal Maritime Commission authorized the assessment since the applicable tariffs were on file as provided by section 18(b) of the Shipping Act (46 U.S.C. § 817(b)) and also on the basis of Clause 5 of the bill of lading which is comparable to the Liberties Clause in issue here, except for the language which authorized the carrier to "proceed by any route . . . ." (Leavell, supra, 13 F.M.C. at 81, 1969 A.M.C. at 2182). This is the very language relied upon by the Commission in finding the surcharge appropriate (Leavell, supra, 13 F.M.C. at 89, 1969 A.M.C. at 2191) where the carrier proceeded to the initially disignated port of destination via the Cape of Good Hope. Utilization of an alternate route contemplates berthing at the contracted port of destination. There is no such language in the clause at issue. Its absence fortifies the contention that the Liberties Clause was not intended to be applicable to the facts in litigation here.

Matters involving impossibility or impracticability of performance of contract

are concededly vexing and difficult. One is even urged on the allocation of such risks to pray for the "wisdom of Solomon." 6 A. Corbin, Contracts § 1333, at 372 (1962). On the basis of all of the facts, the pertinent authority and a further belief in the efficacy of prayer, we affirm.

---

herein provided, it shall be at its own risk and expense; such discharge shall constitute complete delivery and performance under this contract and the Owner shall be freed from any further respon-

sibility. For any service rendered to the cargo as herein provided the Owner shall be entitled to a reasonable extra compensation."