Galin ATAEI, Plaintiff,

v.

M/V BARBER TONSBERG, her engines, boiler, tackle, etc., and Barber Lines A/S Blue Funnel Line, the Swedish East Asia Company Ltd., d/b/a Barber Blue Sea Line and John Swire & Sons (Japan) Limited, Defendants.

No. 80 Civ. 6374 (IBC).

United States District Court, S.D. New York.

July 2, 1986.

Hill, Rivkins, Carey, Loesberg, O'Brien & Mulroy, New York City, for plaintiff; Caspar F. Ewig, of counsel.

DeOrchis & Partners, New York City, for defendants; M.E. DeOrchis, Manuel R. Llorca, of counsel.

IRVING BEN COOPER, District Judge.

Plaintiff, the consignee and receiver of a shipment of one container of "household goods" including expensive Persian rugs delivered to her three years after it was shipped from the nation of Bahrain, brings this action to recover damages arising from the delay in delivery. Defendants, the carrier and several of her agents, counterclaim for a lien on the shipment for costs connected with stopping and holding the cargo as well as expenses incurred in litigation arising out of this matter. A trial by

submission was held before us on January 6, 1986.[1]

In open Court, plaintiff moved for summary judgment dismissing the counterclaim on the basis that it violates the Shipping Act of 1916; defendants moved that the case be dismissed on the grounds that the plaintiff had no interest in the goods, thus no right to bring the suit, and that since the shipper misdescribed the rugs as household items in the bill of lading, the carrier should not be liable for any consequences to the rugs. We reserved decision on the motions.

At the conclusion of the trial decision was reserved; posttrial briefs were received from defendants on March 18, 1986, from plaintiff on April 29, 1986.

### FACTS

In the latter half of 1980, Mr. Kamran Ataei, residing in Bahrain, sent 107 packages of household goods, including 18 (Ex. 2c at 27, 30)[2] valuable Persian rugs to his mother, plaintiff Galin Ataei, who resided in San Jose, California. The goods travelled in a 20 foot container on board defendants' carrier, the M/V Barber Tonsberg, travelling from Bahrain to Los Angeles then onto San Jose pursuant to a straight, non-negotiable bill of lading dated August 9, 1980 (S.F. No. 1; Ex. A) that designated as the shipper not the name of plaintiff's son, Mr. Kamran Ataei; it bore the name "Sahel Exhibition Persian Carpets" (S.F. No. 2), a store owned by a Mr. Mohammed Eshaq. According to the Director of the Bahraini Criminal Investigations, Mr. Ataei was employed by Mr. Eshaq. (Ex. B) The bill of lading listed plaintiff as the consignee (S.F. No. 2) and confirmed that the freight had been prepaid. (S.F. No. 3) The shipment was to arrive in San Jose on or about October 13, 1980. (S.F. No. 10)

The M/V Barber Tonsberg sailed from Bahrain on September 8, 1980. (S.F. No. 4) Approximately ten days· later, while en route to its stop in Yokohama, Japan, the carrier received a communication from Sahel Exhibition Persian Carpets claiming that the Persian carpets in the container were stolen from the alleged true shipper; the store requested that the container remain on board for delivery back to Bahrain. (S.F. No. 5) Subsequent to September 18 and prior to September 24, the Bahrain Criminal Investigation Directorate ("CID") orally communicated to defendants a request that the carpets be stopped. (S.F. No. 6) The notice was confirmed in a letter dated September 24, 1980; the translation into English from Arabic reads:

> [Mr. Eshaq] has reported to the Police that an employee ... stole a quantity of valuable Iranian Carpets, and shipped the stolen carpets in a container through your agency via M/V Barber Tonsberg ...
>
> As this container is connected to a criminal case, you are requested to please stop the shipment and off load at the nearest port, to be returned to Bahrain at the expenses of the complainant who has submitted a legal declaration ... certifying that he will be responsible for any civil disputing the ownership of the said property.
>
> (signed)
> (Director, CID)

*See also* S.F. No. 7.

After receiving this letter, defendants contacted Mr. Murad Saleh, Esq., a Bahraini attorney, who advised them over the telephone (Ex. 2B at 20) that if they did not comply with the order, they might be subject to criminal prosecution for aiding the offender. (Ex. 2B at 5)

The carrier arrived in Japan between September 25–30, 1980, discharged the container in Yokohama (S.F. No. 11) and de-

---

**1.** The parties submitted an agreed statement of facts, a packet of agreed exhibits, proposed findings of fact, pre-trial memoranda, and replies to the pre-trial memoranda.

**2.** Throughout this opinion, the letters "Ex." followed by a number or letter indicate a particular exhibit. The same is true for the letters "Tr." which refer to a particular page in the trial transcript. The letters "S.F." stand for "stipulated fact."

parted on September 30 for Los Angeles where it arrived on October 11, 1980. (S.F. No. 10) On October 27 the carrier received a communication from the Bahraini CID informing it that Mr. Ataei had been charged with stealing the rugs and ordering defendants to return the container to Bahrain (S.F. No. 8) under threat of prosecuting the carrier if it failed to comply. The CID document stated:

> The Public Prosecutor, Bahrain, ... hereby orders Barber Blue Sea ... that the ... container be returned to Bahrain by the first available ship. *Failure to comply immediately with this order will render you liable to criminal prosecution in Bahrain.*

(Ex. F–4)

The carrier did not make any move toward returning the container to Bahrain, and 11 days later, on November 7, 1980, plaintiff commenced an action in Yokahama; the Japanese court issued an order on that date stating that "[t]he properties ... shall not be moved from ... Yokohama by the obligor other than by shipment of the said properties by ship to Los Angeles, California, U.S.A." (Ex. C) Plaintiff posted 1.5 million yen (equivalent to $6,000) with the Japanese Court to cover the restraint; that money remains in that Court. (S.F. No. 12; Ex. C) Two days later plaintiff commenced the instant action in accordance with the jurisdictional clause of the bill of lading. (S.F. No. 13)

Maintaining the contents of the container, the expensive Persian rugs, was costly. The carrier paid for surveys of the container (Ex. N), warehouse storage charges, also chemicals inserted into the container to avoid contamination. (Ex. N) Further, insurance was arranged (Ex. E) to protect the owner in case the rugs were stolen or caught on fire (the marine insurance which covered the cargo on the vessel was not applicable when it was discharged on shore). (Tr. 11)

Since Mrs. Ataei did not receive the detained container holding, in addition to the Persian rugs, a variety of household goods: couches, chairs, a refrigerator, china, etc., she purchased replacements. (Ex. 2C at 14–16) According to plaintiff's son Mehran Ataei who resides with his mother, plaintiff spent more than $30,000 therefor. (*Id.*) However, no proof in support of this claim was introduced.

On July 10, 1983, defendants were advised by Mr. Eshaq that he and Mr. Ataei had resolved their differences and that the container could be forwarded to its California destination. (S.F. No. 14; Ex. D) The Bahraini Court had considered the matter and, after reviewing an auditor's report, concluded that cash payments were made to Mr. Ataei by Mr. Eshaq totaling 169,-897.410 Bahraini Dinars ("BD") (exchange rate unspecified); that BD 2,800.00 in sales proceeds assignable to Mr. Ataei were missing from Mr. Eshaq's store; that Mr. Ataei gave Mr. Eshaq BD 38,400.00 in dishonored checks; and that Mr. Ataei took carpets from the stock in Mr. Eshaq's store in the amount of BD 178,645.00. The Court ordered Mr. Ataei to pay to Mr. Eshaq BD 484,624, which included Court costs, expert's fees and attorney's fees. It should be noted that the Court did not expressly find Mr. Ataei criminally responsible. (Ex. F)

The carrier shipped the goods to Mrs. Ataei on board the M/V Barber Priam for destination Los Angeles. (S.F. No. 15) When the goods were delivered to plaintiff, defendants issued an original freight bill with an annexed schedule detailing the following outstanding costs and expenses incurred in maintaining the goods since September 1980 (S.F. No. 16):

| | |
|---|---|
| $46,342.43 | in legal fees incurred in New York, Japan and Bahrain |
| 11,250.00 | in insurance |
| 2,604.23 | to lease the container storing the rugs |
| 2,072.69 | in survey fees |
| 2,049.39 | in storage fees |
| $64,318.74 | TOTAL |

(Ex. E; J)

All the cargo other than the rugs was delivered to plaintiff; the rugs were and continue to be held in escrow pending the

outcome of this litigation. The defendants have not waived their lien. (Ex. AA)

On October 5, 1983, plaintiff instituted a third action before the Federal Maritime Commission ("FMC") requesting declaratory and injunctive relief. In that action plaintiff claims that defendants' actions violated several sections of the Shipping Act; her claim for relief includes a court order directing defendants "to cease and desist from ... violations of [the Act] and to establish, observe and enforce such just and reasonable regulations and practices relating to or connected with the handling, storing and delivery of property as the Commission may determine to be lawful; ... to cease and desist from charging and demanding, and attempting to receive and collect [the costs of attorney's fees, insurance, lease of the container, survey and storage] as a precondition to their delivery of [plaintiff's] cargo; [and] that [defendants'] vessels be refused the right of entry into any port of the United States, or any Territory, District or possession ... until ... the violation has ceased. (Ex. V)

In the instant case defendants contend plaintiff cannot recover damages for delay since clause 9 of the bill of lading limits defendants' liability. Plaintiff counters that defendants breached the bill of lading by unreasonably deviating from it and therefore cannot take advantage either of the limitation of liability clause or of any clauses which would allow it a lien on the shipment. Plaintiff further claims that defendants' tariff controls the charges that the carrier is entitled to, not the bill of lading. Finally, defendants claim that the filing of this action constitutes an abuse of the judicial process.

■ Before addressing the merits of the action, we note that at trial defendants moved to dismiss on the grounds that "the plaintiff has no interest in these goods, was not the owner of the goods, and had therefore no right to bring this suit." (Tr. 23) We disagree. Plaintiff was listed as the consignee on the bill of lading between the parties; moreover, she was the owner of all the household goods enclosed in the con-

tainer defendants unloaded except the Persian rugs. After Kamran Ataei paid for the rugs, they were sent to plaintiff as owner. Accordingly, defendants' motion to dismiss on this ground is denied.

## THE LAW

### I. Charges in the Tariff Compared to Charges in the Bill of Lading

Plaintiff contends that as a common carrier, Barber Blue Sea Line (operator of M/V Barber Tonsberg) is required by the FMC to file a tariff with the Commission which the FMC must approve; that under the provision of the Shipping Act of 1916, 46 U.S.C. §§ 801 and 817, a carrier is absolutely bound to its filed tariff. Thus, plaintiff reasons, a "carrier is only allowed to collect charges that are set forth in its tariff and, if a charge incurred by the carrier is not provided for in the tariff, then the carrier is not lawfully entitled to collect that sum." (Plaintiff's pre-trial memorandum, at 13)

■ Title 46 of the United States Code, section 817, provides that "[e]very common carrier by water ... shall file with the [FMC] ... the maximum rates, fares, and charges for or in connection with transportation between points on its own route." The tariff system is designed to prevent rate discrimination, i.e., giving different prices for the carriage of goods to different shippers. See Insurance Company of North America v. S/S American Argosy, 732 F.2d 299, 303 (2d Cir.1984); Aero Trucking, Inc. v. Regal Tube Co., 594 F.2d 619, 621 (7th Cir.1979); see also United States v. Pan American Mail Line, Inc., 359 F.Supp. 728, 737 (S.D.N.Y.1972) (tariff prohibits a carrier from billing a shipper at a discount price to attract future business.) However, the rates that are required to be filed in the tariff must bear on the transportation of goods or services in connection therewith, see Lowden v. Simond Etc. Grain Co., 306 U.S. 516, 520, 59 S.Ct. 612, 614, 83 L.Ed. 953 (1939); Louisville & Nashville Railroad Co. v. Maxwell, 237 U.S. 94, 97, 35 S.Ct. 494, 495, 59 L.Ed. 853

(1915), including charges for tollage, wharfage and handling. *Pan American Mail Line, supra,* at 736. Costs that fall outside of services connected with transportation need not be listed in the tariff; for example, clauses involving the carrier's limitation of liability are not considered charges or rates requisite in the carrier's tariff. *See Allstate Insurance Co. v. International Shipping Corp.,* 703 F.2d 497, 500 (11th Cir.1983) (quoting *Marvirazon Compania Naviera, S.A. v. H.J. Baker & Brothers, Inc.,* 674 F.2d 364, 366 nn. 1 & 2 (5th Cir.1982)). As the FMC stated in the case of *C.H. Leavell & Co. v. Hellenic Lines, Ltd.,* 13 F.M.C. 76, 85 (1969):

> The shipping public is entitled to be provided with advance notice of rates certain to be charged and which will be charged equally to all shippers for the same services. This does not mean, however, that in all cases and under all circumstances the conditions will prevail which will permit strict adherence to those requirements.
>
> Business life is filled with intangible elements and non-quantifiable factors. This is especially true in the business of ocean transportation and is recognized, in particular, in the contracts which are employed between carriers and shippers. . . .
>
> It cannot be practically expected that carriers can put a predetermined price on every conceivable contingency of the kind to which ocean transportation is subject.

Defendants counterclaim against plaintiff for expenses that arose out of defendants' storage of plaintiff's goods in Japan. We find that these costs cannot be categorized as rates bearing on "transportation and services in connection therewith"; consequently they were not required to be included in defendants' tariff. Instead, recovery for these expenses is properly covered in paragraphs 8 and 11 of the bill of lading, the contract of carriage (Ex. A) which deals with costs incident to the discharge and storage of cargo.[3]

On the basis of our finding that the costs charged by defendant did not have to be included in the carrier's tariff, we deny the motion by plaintiff made at trial for summary judgment and dismissal with prejudice.

## II. Unreasonable Deviation from the Bill of Lading

Plaintiff next argues that defendants deviated unreasonably from the bill of lading by depositing the containers in Japan. As a matter of law, if a carrier *deviates unreasonably* from a bill of lading, it breaches that contract of carriage and "ousts" the provisions contained therein. *See General Electric Co. International Sales Division v. S.S. Nancy Lykes,* 706 F.2d 80, 86 (2d Cir.1983), *cert. denied,* 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1984); *Mobil Sales & Supply Corp. v. M.V. "Banglar Kakoli",* 588 F.Supp. 1134, 1146 (S.D.N.Y.1984) (Weinfeld, J.). The rationale underlying this rule is that such deviations unjustifiably expose cargo to un-

---

**3.** We disagree with plaintiff's contention that Rule 27(a) of defendants' tariff is applicable to the instant situation. That rule provides in relevant part:

> Cargo Discharged At Other Than Bill of Lading Port
> (A) Diversion made by Ocean Carrier
> When the ocean carrier discharges cargo at a terminal port other than the port named in the ocean Bill of Lading, the ocean carrier may arrange at its option for movement via rail, truck or water of the shipment from the port of actual discharge only as indicated hereunder:—
> 1) To ocean carrier's terminal at port of destination declared on the Bill of Lading at the expense of the ocean carrier.

As we read Rule 27, it applies when cargo is discharged at a port other than the one named in the bill of lading either because circumstances did not permit entry into the named port or because of error, and the cargo must therefore be transported to the correct destination by whatever means available.

In contrast, the goods herein were purposely unloaded in Yokohama although the vessel was going to Los Angeles, the port named in the bill of lading. The cargo was held up pending a determination whether to send it to Los Angeles or to return it to Bahrain as requested by that government. At the time the cargo was discharged in Japan, the carrier had no intention of arranging to move it to the port of destination.

anticipated and additional risks—a serious breach of the carriage contract, *see General Electric Co., supra,* at 87, and a violation of section 3(2) of COGSA, 46 U.S.C. 1303(2) which bestows on the carrier a duty to "properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried" in accordance with the agreement of the parties. The legal consequence of an unreasonable deviation is to deprive the vessel, the breaching party, of its right under the contract which it breached.

For the purposes of this rule a deviation has been defined as follows:

> To deviate, lexicographically, means to stray, to wander. As applied in admiralty law, the term "deviation" was originally and generally employed to express the wandering or straying of a vessel from the customary course of the voyage, but in the course of time it has come to mean *any variation in the conduct of a ship in the carriage of goods whereby the risk incident to the shipment will be increased,* such as carrying the cargo on the deck of the ship contrary to custom and without the consent of the shipper, delay in carrying the goods, failure to deliver the goods at the port named in the bill of lading and carrying them farther to another port, or bringing them back to the port of original shipment and reshipping them.

*Spartus Corp. v. S/S Yafo,* 590 F.2d 1310, 1313 (5th Cir.1979) (quoting *G.W. Sheldon & Co. v. Hamburg Amerikanische Packetfahrt A.G.,* 28 F.2d 249, 251 (3d Cir.1928) (emphasis added; emphasis in original text omitted)). *See General Electric Sales Co., supra,* at 84; *Mobil Sales & Supply Corp., supra,* at 1142 ("whether a deviation occurred—turns upon 'what the contract voyage is taken to be.' ") (quoting G. Gilmore & C. Black, *The Law of Admiralty,* § 3–40, at 177 (2d ed. 1975)).

The bill of lading in the instant case provided, *inter alia:*

> 8. Routes, Liberties. In any situation whatsoever which in the judgment of the Carrier ... is likely to give rise to risk of seizure, fine, detention, delay or disadvantage to the goods, ... or to the Carrier ... the goods may, without notice, be discharged, ... stored ... without responsibility of the Carrier.[4]

■ By the time the carrier had reached Yokohama, it had received both oral and written communications from the government of Bahrain explaining that a charge of theft of the carpets had been lodged and requesting that the carpets be offloaded and returned to Bahrain (Stipulated Facts Nos. 5–7), as well as advice from defendants' Bahraini attorney that failure to comply with the request might meet with criminal prosecution against them for aiding the offender. (Ex. 2B at 5) Under the circumstances, defendants complied with paragraph 8 of the bill of lading which allowed the carrier to discharge and store the goods when there was a risk of fine or disadvantage to the carrier. We are of the firm opinion that defendants did not deviate from their bill of lading.

■ Furthermore, at no time did the carrier abandon its responsibility under § 3(2) of COGSA to properly and carefully care for the goods. Though the items were stored in Yokahama for three years, caught between conflicting orders of two nations, none of the goods incurred any damage. Defendants inspected and insured the household items and fumigated the carpets. In no way did defendants increase the risk to the goods—the concern underlying the concept of deviation.

In short, we do not believe the delay in delivery of plaintiff's goods amounted to a "deviation" under the admiralty law.

■ Even if we were to find that there was a deviation, however, we are convinced that it was reasonable. Section 4(4) of COGSA, 46 U.S.C. § 1304(4) provides:

---

**4.** We have serious questions about whether the added clause "without responsibility of the Carrier" is violative of the Carrier's duty under section 3(2) to properly and carefully care for the goods. However, we need not and do not reach this issue.

Any deviation in saving or attempting to save life or property at sea, or any reasonable deviation shall not be deemed to be an infringement or breach of this chapter or of the contract of carriage, and the *carrier shall not be liable for any loss or damage resulting therefrom:* Provided, however, That if the deviation is for the purpose of loading or unloading cargo or passengers it shall, prima facie, be regarded as unreasonable.

*Id.* (emphasis added).

As our Circuit Court of Appeals has stated:

a deviation is unreasonable, thereby breaching the contract of carriage, when, in the absence of significant countervailing factors, the deviation substantially increases the exposure of cargo to foreseeable dangers that would have been avoided had no deviation occurred. *See also* G. Gilmore & C. Black, *supra.* at 179 ("The carrier ... is always subject to the 3(2) [of COGSA, 46 U.S.C. § 1303(2) (1976)] duty to care for and carry the goods properly, and his decision on a route would seem to be improper and unreasonable whenever it is made in disregard of that duty.").

*General Electric Sales Co., supra,* at 86.

Since the vessel herein was pre-scheduled to stop in Yokohama (Ex. Z) and did not stop there merely for the purpose of unloading the cargo, defendants did not unreasonably deviate pursuant to the provisions of COGSA. Furthermore, as we have already concluded, the deviation did not substantially increase the cargo's exposure to anticipated dangers; defendants properly cared for the goods over three years' time due to the factors hereinabove dealt with.

Third and significantly, we note the circumstances under which defendants decided to store the goods in Japan rather than transport them to the United States: the Bahraini government had requested defendants to return the allegedly stolen carpets to that nation—under threat of crimi-

nal prosecution, according to Bahraini legal counsel. We find this situation to be quite distinguishable from that encountered by the carrier in *Spartus Corp. v. S/S Yafo,* 590 F.2d 1310 (5th Cir.1979). In that case the carrier offloaded the shipper's cargo at a port other than that designated by the bill of lading after the Israeli government's instruction that it unload its cargo, take on certain military supplies and return to Israel. The Fifth Circuit Court of Appeals found that the sole reason for the carrier's action was its desire to increase Israeli military preparedness; the motivation was "moral pressure," not any warlike emergency in Israel. The Court concluded that the deviation was not reasonable.

In contrast, the determination by defendants herein to offload at Yokohama was not motivated by "moral pressure"; underlying the decision was the threat of criminal prosecution in Bahrain against defendants. Indeed, the attorney's advice with respect to the consequences of failing to comply with the government request was confirmed by the Bahraini CID order of October 27, 1980 stating that: "The Public Prosecutor, Bahrain, ... hereby orders Barber Blue Sea ... that the ... container be returned to Bahrain by the first available ship. *Failure to comply immediately with this order will render you liable to criminal prosecution in Bahrain.* (Ex. F-4) (emphasis in original) Before defendants had an opportunity to comply with this official order, the Japanese court order was issued, stating that "[t]he properties ... shall not be moved from ... Yokohama by the obligor other than by shipment of the said properties by ship to Los Angeles, California, U.S.A." (Ex. C) In light of the totality of circumstances, we do not hesitate to conclude that the decision of the carrier herein was eminently reasonable.

■ There is an additional reason why it was reasonable for defendants to unload the cargo in Japan. As defendants correctly note, section 10 of the Bills of Lading Act,[5] 49 U.S.C. § 90, states:

**5.** Although this Act is inapplicable to bills of

lading issued in foreign ports, United States

Where a carrier delivers goods to one who is not lawfully entitled to the possession of them, the carrier shall be liable to anyone having a right of property or possession in the goods if he delivered the goods otherwise than as authorized ... and, though he delivered the goods as authorized ... he shall be so liable if prior to such delivery he—

(a) Had been requested, by or on behalf of a person having a right of property or possession in the goods, not to make sure delivery, or

(b) Had information at the time of delivery that it was to a person not lawfully entitled to the possession of the goods....

In accordance with this provision, had defendants not discharged the goods in Japan when notified by the shipper listed on the bill of lading (Sahel Exhibition Persian Carpets) that the cargo was allegedly stolen, the carrier could have been liable to the shipper. *See also Wabco Trade Co. v. S.S. Inger Skou,* 482 F.Supp. 444, 448 (S.D. N.Y.1979).

Since we find that the carrier did not unreasonably deviate from its bill of lading, it follows that the relevant provisions of that contract must be upheld unless they are violative of COGSA or public policy. The relevant provisions of the bill of lading read:

8. Routes, Liberties. In any situation whatsoever which in the judgment of the Carrier ... is likely to give rise to the risk of seizure, fine, detention, delay or disadvantage to the goods, to the container, or to the Carrier, ... the goods may, without notice, be discharged, ... stored, ... without responsibility of the Carrier, all at the expense and risk of the goods, and all charges additional freight or other expenses incurred shall be paid by the Shipper, Owner, Consignee or

Holder hereof and shall be a lien on the goods.

9. Damages. The Carrier's liability for unreasonable delay shall be limited to the freight for the transport covered by the bill of lading....

11. Carrier's liens. The Carrier shall have a lien on the shipment for ... fumigating, inspecting, ... demurrage, ... surveys, ... port charges; ... any expenses incurred by it ... for ... legal fees incurred in connection with attachment, seizure, detention, condemnation or other legal proceeding brought against the shipment by authorities or by third parties. The Shipper [and] Consignee ... agree to be jointly and severally liable ... for payment of all said expenses.

Pursuant to paragraph 9, defendants are not liable to plaintiff for the three year delay in delivering her goods. We disagree with plaintiff's argument that paragraph 9 is violative of section 3(8) of COGSA, 46 U.S.C. § 1303(8) which states:

Any clause, covenant, or agreement in a contract of carriage relieving the carrier or the ship from any liability for loss arising from negligence, fault, or failure in the duties and obligations provided in this section, or lessening such liability otherwise than as provided in this chapter shall be null and void and of no effect.

 Since we fail to find any "negligence, fault, or failure in the duties and obligations of defendants, we conclude that paragraph 9 does not violate section 3(8) of COGSA; further, we have found no other provision of COGSA which is violated by this paragraph. Consequently, we are compelled to find that defendants are not liable to plaintiff for the delay in delivery.[6]

Paragraph 11 of the bill of lading gives the carrier a lien on the shipment for its

courts have recognized it to be a codification of general legal principles even in situations where, as here, the COGSA statute regulates the shipment. *See Portland Fish Co. v. States Steamship Co.,* 510 F.2d 628, 631–32 (9th Cir. 1974).

6. Because we find defendants not liable, we do not consider the defenses they raise under 46 U.S.C. § 1304(2)(g) and (i).

expenses incurred while fumigating, inspecting, surveying, and for demurrage, surveys, port charges, and legal fees. Defendants herein claim damages for legal fees, insurance, the lease of the container, survey fees and storage fees. Since we find that paragraph 11 does not violate any sections of COGSA, we proceed to examine each category of damages seriatum.

(1) Legal fees: Paragraph 11 allows the carrier a lien for "legal fees incurred in connection with attachment, seizure, detention, condemnation or other legal proceeding brought against the shipment by authorities or by third parties." Plaintiff argues that both the litigation in New York and that in Japan were brought by the consignee of the bill of lading, not by governmental agencies or third parties; that no legal proceedings were brought against the goods in Bahrain; that no order with respect to the goods was issued until the goods had been discharged in Japan; and that as a matter of law, ambiguous provisions of a bill of lading must be construed against the interest of its author, the carrier, and in favor of the consignee (citing *Mamiye Brothers v. Barber S.S. Lines, Inc.*, 241 F.Supp. 99 (S.D.N.Y.1965)). Defendants, on the other hand, argue that the entire series of events grew out of the Bahraini government's formal requests that the cargo be detained and returned to Bahrain; that the Japanese court also ordered detention of the goods; that the third party behind these legal actions is Kamran Ataei who shipped the goods (though he did not name himself as shipper or consignee) and who was the real instigator of all the legal proceedings; and that the consignee had no right of dominion over the goods until delivery, (citing *Interstate Window Glass Co. v. New York, N.H. & H.R.C.*, 104 Conn. 342, 133 A.102 (Conn.1926)); thus, she was a third party.

We find first that plaintiff is not a third party under the meaning of paragraph 11. Paragraph one of the bill of lading provides that "[t]he terms of this bill of lading constitute the contract of carriage, which is between the Shipper, Con-signee, Owner of the goods and the owner and/or demise Charterer of any carrying vessel." As consignee, plaintiff was a party to the contract and cannot be considered a "third party" under the terms of the same contract.

Second, with regard to the proceedings brought in Japan to detain the goods, we cannot conclude that anyone other than plaintiff instituted the action. There is no evidence in the trial record that they were brought by her son Kamran Ataei, who was neither the shipper nor the consignee on the bill of lading and was thus a third party to that contract. Nor is there any proof that the detention proceeding was initiated by a governmental agency.

Third, with respect to the involvement of the Bahraini government: We find that the requests and order by the Bahraini CID to return the shipment to Bahrain did result in "legal proceedings" in the sense that the defendants had to consult with Bahraini attorneys to be apprised of their rights and duties under the laws of that nation. Moreover, the government requests and orders were directed against the shipment as provided in paragraph 11 of the bill of lading, not against the carrier. Accordingly, we find that defendants are entitled to a lien on the cargo for legal fees and costs incurred in the proceedings in Bahrain.

However, attorneys' fees and costs associated with the proceedings in Japan and New York are not covered by paragraph 11. The litigation in both of these countries was commenced against the carrier, not against the shipment as provided in that paragraph. Furthermore, paragraph 11 specifically states that the carrier has a lien for legal fees and costs incurred in connection with a legal proceeding "brought by authorities or by third parties." The clause does not state, for instance, that the proceeding must be brought by *or instigated by* authorities or third parties. Although we do not hesitate to conclude that the instigator of the legal proceedings in New York and Japan was Mr. Kamran Ataei, a third party, none of

the actions were "brought by" him.[7] Accordingly, we are compelled to find that defendants do not have a lien on the shipment for legal fees and costs incurred in the New York and Japanese litigations.

■ (2) Defendants next claim they are entitled to a lien on the shipment for insurance costs they incurred while storing the goods in Japan. We have already found that in discharging and storing the goods defendants acted in accordance with paragraph 8 of the bill of lading, allowing for discharge and storage whenever a situation is likely to give rise to the risk of disadvantage to the carrier. It follows that, pursuant to the same paragraph, all the expenses incurred in connection with that discharge and storage shall be a lien on the goods. Since insurance fees were a necessary expense once the goods were lawfully stored, we find that defendants have a lien for those costs. Plaintiff argues that she, not defendants, should have determined whether the cargo needed to be insured. (Tr. 17) To the contrary, we find that had the carrier not insured the goods against risks such as fire and theft, it would have violated its duty under section 3(2) of COGSA to properly and carefully attend to the goods.

■ We do not agree with plaintiff's claim that costs for insurance are precluded by Rule 25 of defendants' tariff which provides that "no premiums for account of shipper may be absorbed by the carrier ..." As we have already found, the provisions of the tariff were intended to govern the freight for transportation and services in connection therewith; since the unloading of plaintiff's cargo does not fall in that category, the insurance limitation written into the tariff is inapplicable.

(3) Lease of the container within which plaintiff's goods were stored is the next category of damages. Like the insurance costs, we find that leasing the container was a fee incident to the lawful storage of the goods; defendants are entitled to a lien on the shipment for costs incurred by the lease.

■ (4) In accordance with the clear language of paragraph 11, defendants have a lien for expenses incurred for surveys of the goods.

(5) Finally, defendants claim a lien for storage charges in Japan. We conclude that such charges are "expenses incurred" for "storage" pursuant to paragraph 8 of the bill of lading; defendants may enforce their lien for these expenses.

In sum, we find that plaintiff may not recover any damages for delay in delivery. Defendants, on the other hand, have a lien on the cargo for legal expenses incurred in Bahrain as well as costs incurred for insurance, lease of the container, surveys and storage charges.[8]

### III. Abuse of Process

Defendants also claim special damages on the ground that plaintiff abused the judicial process by filing a third complaint with the FMC. Defendants argue that the FMC complaint was directly aimed at obtaining leverage against and harassing them; that its focus was not on rectifying a breach of any FMC regulation.

■ As plaintiff correctly points out, the claim of abuse of process was not heretofore asserted in defendants' answer, nor has any motion been made to amend the answer. However, in recognition of the liberal policy to allow amendments of pleadings contained in Fed.R.Civ.P. 15(a), and in view of the fact that both parties

---

**7.** Obviously, even if we were to conclude that Kamran Ataei was not a third party but was the actual (though not designated) shipper, defendants would still not be able to recover under paragraph 11 for legal fees in connection with the New York and Japan litigations.

**8.** Since we find that defendants have a lien on the cargo for the expenses outlined, we do not

address defendants' additional arguments based on the concepts of stoppage *in transitu*, which seems on its face to warrant merit, and misdescription of goods, which seems to be inapplicable because the damages did not arise or result from the misdescription. *See* 46 U.S.C. § 1303(5).

have submitted arguments on the issue, we will treat defendants' claim as a motion to amend which we hereby grant.

An abuse of process is a misapplication of the legal process to obtain a result other than that which the law intended the proceeding to effect. W. Prosser, *The Law of Torts*, § 121, at 856 (4th ed. 1971). The action must have been commenced in order to gain a collateral advantage ordinarily unconnected with that type of action. *Id.* at 857. The basic elements of a cause of action for abuse of process are: (1) an ulterior purpose, and (2) a willful act in the use of the process not proper in the regular course of the proceeding. *Id.* Another necessary ingredient is actual damage. *Id.* at 858.

■■■ In the instant case, we find a complete absence of any proof demonstrating an ulterior purpose on the part of plaintiff in instituting its action before the FMC; indeed, that agency has jurisdiction over actions brought pursuant to the Shipping Act—the statute which forms the basis of all plaintiff's claims in the FMC case. Furthermore, even if defendants did prove that the action was commenced merely to harass and obtain leverage against them, plaintiff has failed to prove that these objects were in any way achieved. *See Italian Star Line v. United States Shipping Board Emergency Fleet Corp.*, 53 F.2d 359, 362 (2d Cir.1931); *Dorak v. County of Nassau*, 329 F.Supp. 497, 501 (E.D.N.Y. 1970). We find defendants have not proven their claim for abuse of process.

## CONCLUSION

In accordance with the foregoing, we are constrained to, and do, find: (1) defendants are not liable to plaintiff for damages incurred by reason of the delay in delivery of the goods; (2) defendants have a lien on the shipment for charges for attorney's fees and expenses incurred in Bahrain and for costs for insurance, lease of the container, surveys, and storage; and (3) defendants have failed to prove their claim based on abuse of process.

In determining the specific amount of damages for which defendants have a lien, we adopt a procedure we have employed many times in the past: We direct the parties to endeavor to agree on a reasonable and proper amount of damages, then to provide us with a proposed form of judgment including such amount agreed upon. If no agreement thereon is reached within 30 days from the date of the filing of this opinion, counsel are directed, pursuant to their proposal, to submit applications for damages to a Magistrate of this Court.

SO ORDERED.