**RAINBOW NAVIGATION, INC., Appellant,**

v.

**UNITED STATES of America.**

No. 91–5028.

United States Court of Appeals, Third Circuit.

Argued June 4, 1991.

Decided June 24, 1991.

George J. Koelzer Of Counsel; Clarkson S. Fisher, Jr. (argued), Ober, Kaler, Grimes & Shriver, Edison, N.J., for appellant.

Michael Chertoff, U.S. Atty., Stuart M. Gerson, Asst. Atty. Gen. and Damon C. Miller (argued), U.S. Department of Justice, Washington, D.C., for appellee.

Before SLOVITER, Chief Judge, GREENBERG and WEIS, Circuit Judges.

## OPINION OF THE COURT

SLOVITER, Chief Judge.

In this admiralty action, plaintiff Rainbow Navigation, Inc., the carrier, seeks to recover from defendant United States, the shipper, additional compensation for twenty-two days that Rainbow's vessel was anchored off the coast of Iceland unable to discharge the government's cargo because of a strike. Plaintiff based its claim primarily on the liberty clause contained in Rainbow's bill of lading. The district court held that the clause did not support the requested recovery, and entered judgment in favor of the government.

### I.

Rainbow operated an ocean common carrier, the RAINBOW HOPE, which was the only U.S.-flagged vessel offering service between the United States East Coast and Iceland in 1984.[1] As required by 46 U.S.C.App. § 817, Rainbow's tariff was on file with the Federal Maritime Commission.

Rainbow accepted bookings from the government for carriage of government military cargo on a voyage scheduled to depart from Norfolk, Virginia, on September 24, 1984. Prior to the time of departure, Rainbow and the government learned of the possibility of a strike in Iceland by civil service employees, including long-

---

1. A federal statute requires the use of vessels bearing U.S. flags for certain government shipments. *See* 46 U.S.C.App. § 1241(b)(1) (1988).

shoremen, to begin on October 4, 1984. Rainbow recognized that such a strike would effectively close the ports of discharge in Iceland, and it informed the government that because of the potential strike it would not sail until September 28. Although there was no change in the status of the strike, the RAINBOW HOPE set sail for Iceland on September 28, 1984. The government gave Rainbow no instructions on whether or not to sail.

On October 4, 1984, the Federation of Government and Municipal Workers of Iceland commenced a general strike. The RAINBOW HOPE arrived at Njardvik, Iceland on October 8, 1984, but was unable to discharge its cargo because of the strike. Rainbow repeatedly asked the government for instructions whether the vessel should wait at anchor or discharge at another port. The government refused to advise Rainbow, stating that instructions were inappropriate because Rainbow was a common carrier. The RAINBOW HOPE remained anchored in the harbor until the strike ended on October 30, 1984. On October 31, the vessel discharged its cargo.

The government paid the freight charges in the amount of $266,370.50. However, it refused to pay Rainbow the extra compensation it sought for the expenses it incurred and its lost freights during the twenty-two days that the ship was delayed in discharging the goods. Thereupon, Rainbow filed this action against the United States for damages under the Suits in Admiralty Act, 46 U.S.C.App. §§ 741–52 (1988). Following a bench trial, the district court entered judgment in favor of the United States, finding that Rainbow's retention of the cargo on board during the strike was not an "extra service" entitling Rainbow to "extra compensation" within the meaning of its bill of lading. *Rainbow Navigation, Inc. v. United States*, 742 F.Supp. 171, 184 (D.N.J.1990). Rainbow filed a timely appeal. We have jurisdiction under 28 U.S.C. § 1291 (1988).

## II.

### A.

The contract of carriage in this case was made up of Rainbow's bill of lading, the government's bill of lading, and Rainbow's freight tariff. It is uncontroverted that when the RAINBOW HOPE arrived at Iceland only to find it could not promptly discharge the goods, clause 5 in Rainbow's bill of lading, the liberty clause, gave Rainbow the authority to choose from a number of options.

That clause provided in part:

In any situation whether existing or anticipated before commencement of or during the voyage, including strikes and work stoppages, which in the Carrier's judgment may give rise to risk of damage, delay or disadvantage to the vessel, her cargo or persons aboard, or make it imprudent to begin to continue the voyage, or to enter or discharge at any port, or give rise to delay or difficulty in arriving, discharging or leaving any port or place, or in making due disposition or delivery of the goods, the Carrier may decline to receive, keep or load the goods, or may discharge the goods into any depot, craft or place or may proceed or return, directly or indirectly, to such other port or place as the Carrier may select and discharge the goods or any part thereof there; may retain the goods on board until the return trip or such time as the carrier thinks advisable; or may forward or transship the goods by any means, but always at the risk and expense of the goods; or may require the shipper or consignee to take delivery at port of shipment or elsewhere, and if he fails to do so, the Carrier may warehouse, store, sell or hold the goods.

The historical background of liberty clauses (which may vary in language from one bill of lading to another) places their function in perspective. At common law, a deviation by a carrier from the terms of contract of carriage was treated as vitiating the contract of carriage, thereby depriving the carrier of the liability limitations contained in the bill of lading. Thus, when the carrier voluntarily departed from the route specified in the contract of carriage the carrier became the insurer of the

goods. *See* T. Schoenbaum, *Admiralty and Maritime Law* § 9–31, at 362 (1987); Friedell, The Deviating Ship, 32 Hast.L.J. 1535 (1981). In an effort to avoid liability the carriers began to include in their bills of lading a liberty clause authorizing deviations from the agreed upon route where certain conditions arise.

■■■ Although it is now typical for carriers to employ broad liberty clauses to avoid liability, these clauses are construed to authorize only reasonable departures from the normal route. *See* C. Black & G. Gilmore, *The Law of Admiralty* § 3–40 at 176 (2d ed. 1975); 2A *Benedict on Admiralty* § 125, 12–17 (6th ed. 1991); *General Elec. Co. v. S.S. Nancy Lykes*, 706 F.2d 80, 83 (2d Cir.), *cert. denied*, 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983); *Ross Indus. v. M/V Gretke Oldendorff*, 483 F.Supp. 195, 200 (E.D.Tex.1980).[2] The district court found that it was reasonable for Rainbow to sail on September 28, 1984. Furthermore, although the liberty clause gave Rainbow the option of discharging the goods at another port because of its inability to discharge them at the Iceland port, the court found that Rainbow's decision to await the end of the strike with the goods on board also was reasonable.

Rainbow argues that in light of these findings and its unambiguous authority under the liberty clause to "retain the goods on board until ... such time as the carrier thinks advisable," it rendered "extra services" within the meaning of the bill of lading by holding the goods on board the vessel for twenty-two days for which it is entitled to "extra compensation." It relies, *inter alia*, on clauses 5(e) and 4(b) of the Rainbow bill of lading. Clause 5(e) states that the Carrier "shall be entitled to reasonable extra compensation" for "extra services

rendered pursuant to this [liberty] clause." Clause 4(b) provides:

> The Carrier shall deliver the goods at the port of discharge named herein or as near thereto as the vessel may safely get, lie and leave always afloat under all conditions of tide, water and weather. Should the vessel be unable for any reason to so discharge it may effect delivery by any means and *all extra time and expense shall be at the expense of the goods.*

(emphasis added).

The district court rejected Rainbow's claim because it held that the ship's retention of the goods on board was a "freight service" for which Rainbow already received compensation under the tariff. On appeal, Rainbow argues that the district court erred as a matter of law when it characterized Rainbow's services at issue here as "freight" rather than as "extra services."

### B.

■■■ "Freight" is the compensation which the shipowner receives for carrying goods. *See* C. Black & G. Gilmore, *The Law of Admiralty* § 5–1, 245. In the absence of contractual modification, "freight" is not earned until the cargo is actually delivered. *See Alcoa S.S. Co. v. United States*, 338 U.S. 421, 422, 70 S.Ct. 190, 191, 94 L.Ed. 225 (1949) ("It is a principle of American maritime law that ocean carrier freight charges are not earned unless and until the goods are delivered to destination."); *Mare Schiffahrtskontor GmbH & Co. v. M/V Oceanhaven*, 763 F.2d 633, 637 (4th Cir.1985) (same).[3]

Goods are not delivered until they are discharged at the final destination accord-

---

**2.** Similarly, the Carriage of Goods by Sea Act (COGSA), 46 U.S.C.App. §§ 1300–1315 (1988), which establishes a statutory scheme of responsibilities with regard to carriers of cargo, provides, *inter alia*, that with exceptions not applicable here "any reasonable deviation shall not be deemed to be an infringement or breach of [the statute] or of the contract of carriage, and the carrier shall not be liable for any loss or damage resulting therefrom." 46 U.S.C.App. § 1304(4). Unreasonable deviations are treated

as a breach of COGSA. *See General Elec. Co. v. S.S. Nancy Lykes*, 706 F.2d 80 (2d Cir.1983); *Nemeth v. General Steamship Corp.*, 694 F.2d 609, 613 (9th Cir.1982).

**3.** COGSA, 46 U.S.C.App. § 1303, is premised on a similar definition of "freight" ("carrier shall properly and carefully load, handle, stow, carry, keep, care for, and *discharge* the goods carried" (emphasis added)).

ing to the contract of carriage. *See Brittan v. Barnaby,* 62 U.S. (21 How.) 527, 535, 16 L.Ed. 177 (1859). Rainbow's tariff, which was on file with the Maritime Commission and was a part of the contract of carriage, applies until the "end of ship's tackle at port of discharge." Indeed, the tariff further provides that all additional charges "beyond ship's tackle" are for account of cargo, and that "[c]ontainers shall be loaded aboard vessel at the expense of the carrier. Carrier shall then transport, discharge and place the containers on U.S. government furnished conveyance or stage the containers for eventual placing on U.S. Government conveyance at carrier's designated terminal in Iceland at the Ocean Rates of freight as specified...."

It thus seems abundantly clear that the parties contemplated that the contract for the carriage of goods (at the tariff specified) did not end until Rainbow discharged the goods in Iceland as required.

### C.

■■■ In essence, Rainbow's argument for extra compensation is that because the liberty clause entitled it to remain anchored in the outer harbor and await the termination of the strike, and it took that action for the benefit of the shipper rather than exercise its option to discharge the goods at another port or return them home, it was entitled to additional compensation. There are several weaknesses in this argument. As we noted above, the history of the liberty clause demonstrates that it was designed to insulate the carrier from damages resulting from reasonable deviations from the contract of carriage, and not as authority to undertake additional services for which the shipper would owe extra compensation.

Moreover, the government notes that even had Rainbow chosen to exercise its option to discharge the goods at another port, Rainbow would have been obliged to deliver the goods ultimately at the required point of discharge. The government relies

on the general principle that government bills of lading require that cargo be delivered to destination before freight is earned.[4] Indeed, government bills of lading have been interpreted to require the carrier to absorb any necessary additional freight or transshipment cost, notwithstanding a contrary provision in the carrier's bill of lading. *See In the Matter of Delta Steamship Lines, Inc.,* 58 Comp. Gen. 799, 801 (1979); *Alcoa S.S. Co. v. United States,* 338 U.S. at 422, 70 S.Ct. at 191. Once it is recognized that Rainbow was obliged to deliver the cargo at the originally designated point of discharge to earn its freight, then its argument that it performed extra services when it waited off shore until the end of the strike becomes unpersuasive.

The cases cited by Rainbow are inapposite. In some, the carriers recovered additional compensation for services beyond delivery to the original destination. For example, in *Colonialgrossisternes Forening v. Moore–McCormack Lines, Inc.,* 178 F.2d 288 (2d Cir.1949), the carrier, which had been unable to discharge the cargo at the port of destination due to military conflict, returned the cargo to the point of departure. Not only was there additional transportation provided (unlike here) but that case did not involve the government as shipper.

In another case Rainbow relies on, *C.H. Leavell & Co. v. Hellenic Lines,* 13 F.M.C. 76, 1969 A.M.C. 2177, 2182 (1969), there was an express provision in the carrier's tariff authorizing a surcharge on all freights "[i]f the expense of transiting the Suez Canal increase[d]." The other case it cites, *Ataei v. M/V Barber Tonsberg,* 639 F.Supp. 993 (S.D.N.Y.1986), is dissimilar because it dealt with compensation for the cost of storing and insuring goods after the carrier had been directed by authorities to discharge its cargo at an intermediate port. Here, unlike *Ataei,* only the cost of transportation and services in connection therewith is at issue.

*See Alcoa v. United States,* 338 U.S. at 422, 70 S.Ct. at 191.

---

**4.** This is in contrast to the prevailing arrangement with private shippers under which freight is paid when the goods are loaded on the vessel.

The closest analog to the case before us is *American Trading & Prod. Corp. v. Shell Int'l Marine Ltd.*, 453 F.2d 939 (2d Cir.1972), in which the owner of a vessel attempted to invoke the liberty clause of its bill of lading to recover additional compensation when the closing of the Suez Canal forced the charterer to take a longer and more expensive route to deliver goods at the port of discharge. That liberty clause, like the one at issue here, authorized reasonable extra compensation for additional services rendered. *Id.* at 944. In denying additional compensation, the court noted that the parties had not conditioned performance on use of the Suez Canal, and "[m]ere increase in cost alone is not a sufficient excuse for non-performance." *Id.* at 942. The liberty clause was deemed unavailing as the basis for extra compensation because "the cargo did reach the designated port albeit by another route, and hence the clause is not applicable." *Id.* at 944.[5]

It follows, after examination of all of Rainbow's arguments, that there is no basis in the documents that constitute the contract of carriage to award it extra compensation for the period it exercised the authority it undoubtedly had to hold the government's goods on board while waiting to discharge them as required at Iceland.

### III.

For the foregoing reasons, the order of the district court will be affirmed.

---

**5.** In *American Trading*, as here, there was no occasion for the court to consider the issue of compensation "where the master, by reason of dangerous conditions, deposits the cargo at some port or haven other than the designated place of discharge." 453 F.2d at 944.